WILLIE SMITH *v*. CROUSE-HINDS COMPANY

[No. 3-575A89. Filed March 22, 1978. Rehearing denied May 1, 1978. Transfer denied with opinion August 15, 1979.]

*William S. Spangler, Jon F. Schmoll, Spangler, Jennings, Spangler & Dougherty,* of Gary, for appellant.

*Winfield L. Houran, Clifford, Hoeppner, Houran, Wagner & Evans,* of Valparaiso, *Carl N. Carpenter, Galvin, Galvin & Leeney,* of Hammond, for appellee.

GARRARD, P.J.—This is an action for personal injury. The plaintiff, Smith, was injured in an explosion at the plant of his employer, Marbon Chemical Co. He sued Crouse-Hinds, the manufacturer of the electrical switches used in the plant claiming that the switches were defective and unreasonably dangerous because they were constructed so that a metal pin might become disengaged and fall out. At trial Smith attempted to place in evidence such a pin, but it was excluded on objection. The court then excluded evidence from Smith's expert witness based upon his examination of that pin. At the conclusion of plaintiff's case, the court granted the defendant's motion for judgment on the evidence. These three rulings constitute the errors raised on appeal.

### I. Plaintiff's Theory

Marbon was engaged in the manufacture of plastics. In the manufacturing process a soap solution was mixed in a tank and then pumped through a line into a reactor where it combined with petrochemicals, including butadene. At room temperature and normal atmospheric pressure butadene exists as a gas. When mixed with air it is highly explosive. Accordingly, to prevent butadene or other components from escaping the reactor, two check valves were installed in the line between the reactor and the soap tank. Near the soap tank was a manually operated valve. Further down

the line was an automatic valve. When closed these valves would prevent materials from backing up into the soap tank.

Crouse-Hinds manufactured electrical switches for use around dangerous materials. The switch was designed to inclose any spark created by operation of the switch so as not to ignite surrounding materials. These switches were used in the Marbon plant at the time of the explosion.[1] It was not claimed by Smith that a defective switch ignited the gaseous atmosphere. There was, in fact, no evidence presented as to the precise cause of ignition. Instead liability was posited upon the assertion that the defective switch caused the creation of the explosive atmosphere which was then ignited by an unknown source.

Smith asserted the switches were defective in that they were constructed so that a metal pin used to activate the switch by the push button on the switchfront could become detached and fall out. He theorized that this occurred and the pin fell into a tote box full of soap awaiting use in the soap tank. The pin was then inadvertently introduced into the soap tank where it went through the pump and into the reactor line. It then lodged in the automatic check valve causing the valve to malfunction. Thus when an employee neglected to close the manual check valve, butadene escaped from the reactor and into the plant atmosphere through the soap tank. His theory was supported by evidence that a metal pin similar to the one used in Crouse-Hinds' switches was found lodged in the automatic check valve when it was disassembled after the explosion.

## II. The Pin

At trial Smith offered in evidence as Plaintiff's Exhibit 1 a metal pin approximately 1 5/8 inches long and 3/4 inches in diameter. The defendant objected that relevancy had not been sufficiently established, and the court excluded the pin.

In considering the correctness of that ruling, we first note that the general standard for the admissibility of evidence as relevant

---

1. There was evidence, however, that the particular type of switch installed at Marbon was not the proper one for use in the kind of dangerous atmosphere that occurred.

is that it makes the sought-for inference more probable than it would be without the evidence. Accordingly, evidence may be found relevant although its ability to persuade is extremely light. *Spears v. Aylor* (1974), 162 Ind. App. 340, 319 N.E.2d 639; McCormick On Evidence (2nd Ed.) § 185, pp. 436-438. However, this does not end the inquiry. There are counterbalancing factors which may cause the court to exclude evidence which is prima facie relevant because they outweigh the probative value of the evidence offered. These factors have been characterized as:

(1) the danger that the evidence offered will unduly arouse the emotions of the jury to prejudice or sympathy;

(2) the probability that the evidence and the answering evidence it provokes will create a side issue that is unduly time consuming or distracting to the jury;

(3) the likelihood that the evidence will confuse or mislead the jury;

(4) the likelihood that the evidence will unfairly surprise the opponent.

*See Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482; *Bradley v. Onstott* (1914), 180 Ind. 687, 103 N.E. 798; *Walters v. Kellam & Foley* (1977), 172 Ind. App. 207, 360 N.E.2d 199; *Spears v. Aylor, supra*; McCormick On Evidence (2nd Ed.) § 185, pp. 439, 440. *See also* Fed. Rules of Evidence, Rule 403. In consequence, the trial court is invested with sound discretion in admitting or rejecting such evidence, and we may reverse only where an abuse of discretion is shown. *Patterson v. State, supra*; *Spears v. Aylor, supra*.

Where physical evidence is offered at trial, it is necessary to recall another distinction concerning relevancy.

"Again, demonstrative evidence may be classified as to whether the item offered did or did not play an actual and direct part in the incident or transaction giving rise to the trial. Objects offered as having played such a direct role, e.g. the alleged weapon in a murder prosecution, are commonly called 'real' or 'original' evidence and are to be distinguished from evidence which played no such part but is offered for illustrative or other purposes." McCormick, *supra*, § 212, p. 527.

Where the offer of physical evidence, either expressly or impliedly, involves the element of personal connection to the matter in issue, e.g. that the item is *the* gun, *the* tire or *the* pin involved in the transaction sued upon, it is inherently logically necessary that the connection be made to appear before the item is received in evidence. Otherwise, it fails to have probative force. In other words, the *authenticity* of the exhibit must be established. This is normally done by prefatory evidence identifying the exhibit as *the* object involved in the incident and disclosing that its present condition is substantially unchanged as to any critical features.[2]

When the exhibit possesses characteristics which are fairly unique and readily identifiable, and it is relatively impervious to change, considerably less stringent requirements may be employed in establishing a foundation for its admissibility. *See, e.g., Elliott v. State* (1972), 258 Ind. 92, 279 N.E.2d 207; *Jackson v. State* (1967), 248 Ind. 579, 228 N.E.2d 3; *Smith v. State* (1961), 241 Ind. 598, 172 N.E.2d 673. (In these cases it was sufficient to sustain admission of the exhibit that it was shown to be connected to the defendant and was "like" one associated with the crime. *Compare* the holding and dictum in *Jackson v. State* (1971), 257 Ind. 477, 275 N.E.2d 538 where a bandana when offered was not shown to be connected to either.) In recognition of these variations in the foundation evidence necessary to adequately authenticate an exhibit offered as "real" evidence, we have recognized that discretion exists on the part of the trial court to determine when a sufficient foundation has been laid for receipt of the exhibit into evidence. *See Piggly-Wiggly Stores v. Lowenstein* (1925), 197 Ind. 62, 147 N.E. 771; *Storckman v. Keller* (1968), 143 Ind. App. 43, 237 N.E.2d 602 upholding the exclusion of evidence. *See also Chrysler v. Alumbaugh* (1976), 168 Ind. App. 368, 342 N.E.2d 908; McCormick, *supra*, p. 527.

Finally, we note the relationship between evidence tendered as "real" or "origianl" and the factors which may counterbalance prima facie admissibility and permit the trial court to exclude evidence within the sound exercise of its discretion. As Professor Wigmore pointed out, beyond the inherent

---

2. Hence the chain of custody requirements for exhibits that are not readily identifiable or are susceptible to change or tampering. *See, e.g. Jones v. State* (1973), 260 Ind. 463, 296 N.E.2d 407.

logical necessity of establishing authenticity of real evidence, ". . . there is a general mental tendency, when a corporal object is produced as proving something, to *assume, on sight of the object, all else that is implied in the case about it.* The sight of it seems to prove all the rest." 7 Wigmore, *Evidence* (3rd Ed.) § 2129, p. 565. Because of this human tendency there is present in the offer of such evidence a potential to mislead the jury.

The significance of the discretionary power on the part of the trial court in determining the relevance-admissibility of an item of real evidence must be underscored since it fixes the standard of appellate review. We may reverse the trial court's determination only upon a showing of abuse of discretion.[3] To establish the necessary abuse, appellant must demonstrate that the ruling was clearly against the logic and effect of the facts and circumstances before the court.[4] *McFarlan v. Fowler Bank City Trust Co.* (1938), 214 Ind. 10, 12 N.E.2d 752; *Temple v. Temple* (1975), 164 Ind. App. 215, 328 N.E.2d 227.

Turning to the question of Plaintiff's Exhibit 1, the defendant correctly points out that no one testified directly that the exhibit was the pin which had been discovered in the check valve after the explosion. However, the following was established through the various witnesses that testified before the pin was finally offered.[5] William Dudak was present when the soap line was dismantled. He saw the pin in the value. He described it as one inch long, ¼ inch in diameter and bright as if made of stainless steel. Another Marbon employee, Jerry Newman, testified that the pin looked like the one he saw when the soap line was dismantled, and that was the only time he had ever seen such a pin. George Johnson testified that the pin shown in Exhibit 4 (identified by Marvin Saltenstein as being a photograph of Exhibit 1) was given to him by

3. Accordingly, cases such as *Elliott v. State, supra,* cited by appellant and sustaining *the admission* of such evidence, are not controlling in demonstrating error when the court excluded the evidence. *Compare, e.g., Piggly-Wiggly Stores, supra.*

4. It appears redundant to add to this, as is sometimes done, "or the reasonable, probable and actual deductions to be drawn therefrom."

5. In part the evidence referred to Exhibit 1 and in part to Exhibits 4 and 5. These latter exhibits were photographs of a steel pin. Plaintiff's expert was able to connect these exhibits with testimony that the tendered pin was *the same* pin that was depicted in the photographs.

Dudak the day after the explosion, and that he had tagged the pin and kept it. Paul Eaton testified that he had been employed by Crouse-Hinds to examine parts of a switch and that he thereafter received from Marbon a pin which he photographed. This photograph was Exhibit 5.

This evidence did not conclusively establish the authenticity of Exhibit 1 as the pin found in the check valve. However, it clearly established the reasonable probability that it was the pin from the check valve. It was therefore prima facie admissible. *Owens v. State* (1975), 263 Ind. 487, 333 N.E.2d 745; *Fletcher v. State* (1970), 253 Ind. 468, 255 N.E.2d 217.

It does not appear that introduction of the pin would have aroused the emotions of the jury, created an unduly time-consuming side issue, or unfairly surprised Crouse-Hinds. What was the likelihood that it would mislead the jury?

Of course, if the pin were admitted it still would be for the jury to determine whether it was the pin found in the check valve, but from what we have already said the evidence was sufficient to permit the inference that it was. The danger that they would then assume the rest of plaintiff's theory as to why and how the pin reached the check valve appears minimal in view of the opportunities for presenting evidence, instructions on the law and argument concerning those elements of the case. Accordingly, the clear logic and effect of the circumstances called for admission of the exhibit into evidence. The court erred in refusing the exhibit and, therefore, further erred in excluding the expert's testimony based upon its examination.

In *Walters v. Kellam & Foley* (1977), 172 Ind. App. 207, 360 N.E.2d 199, the court held that where, as here, evidence is improperly excluded during a plaintiff's case-in-chief and the defendant is then granted a judgment on the evidence, we must reverse unless the harmless effect of excluding the evidence is apparent on the record. The record in this case does not disclose the error was harmless. Plaintiff was relying heavily upon testimony from his expert Saltenstein. Most of this proffered testimony was excluded because of the exclusion of Exhibit 1. Smith pursued his case by proceeding

to pose questions to Saltenstein and make offers of proof when the defense's objections were sustained, sufficiently to preserve error. However, we cannot say that had Smith been permitted to adduce Saltenstein's testimony unhampered by the exclusion of Exhibit 1, he would have inquired no further. *See Walters, supra.*

We therefore conclude the error cannot be considered harmless and that Smith is entitled to a new trial.

Reversed and remanded.

Hoffman, J. concurs; Staton, J. concurs in result.

NOTE—Reported at 373 N.E.2d 923.