**Brian PILKINGTON, Linda Pilkington and State Bank of Lapel, as Guardian over the Estate of Donna Pilkington, Plaintiffs-Appellants,**

v.

**HENDRICKS COUNTY RURAL ELECTRIC MEMBERSHIP CORPORATION and Jack K. Elrod, Defendants-Appellees.**

No. 1–383A66.

Court of Appeals of Indiana, First District.

March 20, 1984.

before allowing relief from default judgment. Potts has shown a prima facie meritorious defense.

Vernon J. Petri, Thomas C. Doehrman, Petri, Fuhs & Doehrman, P.C., Indianapolis, for plaintiffs-appellants.

Wolf, Robak & Murphy, Greenfield, Peter L. Obremskey, Parr, Richey, Obremskey & Morton, Lebanon, for Hendricks County Rural Elec. Membership Corp.

Danford R. Due, Stewart Irwin Gilliom Fuller & Meyer, Indianapolis, for Jack K. Elrod.

NEAL, Presiding Judge.

## STATEMENT OF THE CASE

Plaintiff-appellants Donna Pilkington and her parents (Pilkingtons) appeal an adverse jury verdict returned in favor of defendant-appellees Hendricks County REMC (REMC) and Jack K. Elrod (Elrod). The action arose out of personal injuries Donna received while watching the National Drag Races at Indianapolis Raceway Park on September 3, 1979.

We affirm.

## STATEMENT OF THE FACTS

Nine-year old Donna Pilkington, accompanied by her parents, received electrocution injuries while a spectator at the National Drag Races at Indianapolis Raceway Park (Raceway) on September 3, 1979. The races were sponsored by the National Hot Rod Association (Hot Rod). The incident occurred when another spectator at the top of the temporary metal bleachers which had been erected for the event somehow came into contact with REMC's 7200-volt uninsulated power line. The electricity was conducted down through the stands, into Donna's right hand, and out her back.

The bleachers were installed by Jack Elrod at the direction of Raceway Park. Elrod, in past years, had installed ten row elevated bleachers which rose to a height of 14 feet, 10 inches. This year, however, the management of Raceway Park was expecting a large crowd since it was the 25th anniversary of the National Drags, and it ordered 16 bleacher rows installed. The extra six rows added twelve feet of depth and brought the height of the stands to 18 feet, 10 inches. The power line was located behind the bleachers, and the additional depth and height of the stands put the top of the bleachers in dangerous proximity to the wire: investigation after the accident revealed that the line was 24 inches diagonally from the southeast uppermost corner of the stands. REMC was not informed by Raceway officials of the increased seating capacity of the bleachers and Pilkingtons do not contend that notice was given.

Kurt Walters, an employee of REMC since 1972, was the ground man at the time of the Raceway incident. One of Walters' duties included periodically inspecting the power lines for hazardous conditions. He inspected the lines at Raceway on August 27th, 1979, before the bleachers were assembled. At that time, the power line was in proper position. Walters testified that the bottom wire, the neutral wire, is normally 17–18 feet from the ground while the main wire is 21–22 feet above the ground. There was no evidence in the record that the power line violated the provisions of the National Electric Safety Code in its construction or maintenance.

Suit was originally filed by Pilkingtons against Raceway, the owner and controller of the premises; Hot Rod, the sponsor of the event; Elrod, the contractor; and REMC, who owned the power line. The complaint alleged that all defendants were jointly and severally liable in (1) erecting bleachers of metal; (2) erecting bleachers close to the power line; (3) failing to insulate power lines; and (4) failing to warn spectators. The principal target of the appeal is REMC: at trial and on appeal, the thrust of Pilkington's argument seems to be REMC's failure to inspect. Prior to trial, the suit was dismissed as to Raceway and Hot Rod and proceeded to trial against REMC and Elrod. Jury verdicts were returned in both cases for the latter defendants.

## ISSUES

On appeal, Pilkingtons raise six issues, restated by us:

I. Did the trial court err in giving REMC's tendered instruction number 2 which dealt with the right to assume others will exercise reasonable care;

II. Did the trial court err in giving REMC's tendered instruction number 4 because it was a "pure accident" instruction;

III. Did the trial court err in giving REMC's tendered instruction num-

ber 7 regarding constant surveillance and in failing to give Pilkingtons' tendered instruction number 5;

IV. Did the trial court err in giving REMC's tendered instruction number 3A which dealt with excuse or justification;

V. Did the trial court err in refusing to give Pilkingtons' instruction number 13 regarding the liability of property owners;

VI. Did the trial court abuse its discretion in admitting Elrod's Exhibit B, a sketch which demonstrated the assumed deflection of a utility pole.

## DISCUSSION AND DECISION

*Issue I: Defendant's Instruction Number 2*

This instruction was tendered by REMC, given to the jury, and stated in substance that in absence of notice to the contrary, REMC had a right to assume that Hot Rod, Raceway Park, and Elrod would use reasonable care in the placement and erection of the bleachers, and that REMC had no duty to anticipate negligent acts on their part. Plaintiff-appellants argue that the instruction is an erroneous statement of the law because such language is applicable only in the context of contributory negligence. As an example of the type of contributory negligence case that employs the language in the instruction, Pilkingtons cite *Smith v. Indiana Insurance Company of North America,* (1980) Ind.App., 411 N.E.2d 638, 641 which states:

"unless a party has notice to the contrary he has a right to assume others who owe him a duty of reasonable care will exercise such care."

Plaintiff-appellants correctly argue that no Indiana authority extends the above rule to situations in which a defendant may assume that third parties or co-defendants will exercise reasonable care. However, Pilkingtons cite no authority which prohibits such an extension.

We first observe that negligence, either on the part of a plaintiff or a defendant, is the want of ordinary care. The standard remains constant; in determining whether a party has exercised reasonable care, the considerations utilized in the determination do not vary according to the party. Therefore, if a plaintiff is not guilty of contributory negligence in justifiably assuming that a defendant will exercise ordinary care, then it seems that a defendant likewise is entitled to the same assumption and is not guilty of negligence in assuming that third persons or co-defendants will act accordingly.

In *Toenges v. Walter,* (1941) 109 Ind. App. 41, 32 N.E.2d 95, the court said:

"... one who is lawfully using a public highway, in absence of knowledge to the contrary, has the right to assume that others using it in common with him will use ordinary care to avoid injurying him."

*Toenges, supra,* at 48, citing *Kraning v. Bloxson,* (1937) 103 Ind.App. 660, 9 N.E.2d 107. *See also Opple et al. v. Ray,* (1935) 208 Ind. 450, 195 N.E. 81. Although all above-cited cases are contributory negligence cases, the language is general and not self-limiting.

65 C.J.S. Negligence § 15 (1966) states the rule without qualification:

"A person has no duty to anticipate negligence on the part of others, and in the absence of knowledge or notice to the contrary, is entitled to assume, and to act on the assumption, that others will exercise ordinary care."

Sec. 5(4) adds:

"Likewise, a person is not bound to foresee and provide against casualties which result from an unexpected act of the person injured, or, it has been held, from the unexpectable act of a negligent third person, or the criminal acts of third persons."

William L. Prosser, Law of Torts Sec. 33 (1971), draws no distinction in his discussion between the contributory negligence cases and cases in which a third party is involved. He posits that the hypothetical

reasonably prudent man is required to realize that there is a certain amount of negligence in the world, and when the risk is slight, he is free to proceed on the assumption that others will exercise proper care. Prosser, *supra* at 171. However, when the risk becomes serious, reasonable care may demand precautions against that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated. *Id.* (Citations omitted). Duty arises only where a reasonable person would recognize the existence of an unreasonable risk of harm to others through the intervention of such negligence. *Id.* at 172. He concludes with a recommendation that the probability that such negligence will occur and the magnitude of harm be balanced against the burden upon the defendant of exercising such care in determining liability. *Id.*

■ In Indiana, the standard of care required of companies transmitting electricity is the care a person of reasonable prudence would ordinarily use under like conditions or circumstances. *Jones v. City of Logansport,* (1982) Ind.App., 436 N.E.2d 1138. The doctrine of strict liability is inapplicable to electric utilities. *Hedges v. Public Service Company of Indiana,* (1979) Ind.App., 396 N.E.2d 933.

■ In situations in which injuries have occurred because the general public unexpectedly comes into contact with an uninsulated power line, determination of an electric company's liability is made on the basis of whether the utility *knew or should have known* of the hazard and anticipated the danger. *Jones, supra,* at 1150 (Our emphasis); *Southern Indiana Gas and Electric Co. v. Steinmetz,* (1977) 177 Ind.App. 96, 377 N.E.2d 1381; *Petroski v. Northern Indiana Public Service Co.,* (1976) 171 Ind. App. 14, 354 N.E.2d 736. Liability of a power company for injury or death in supplying electricity to a building with faulty wiring turned on knowledge of defective wiring which was done by third parties in *Aurentz v. Nierman,* (1921) 76 Ind.App. 669, 131 N.E. 832. Absent knowledge or notice, no liability exists.

The following decisions from foreign jurisdictions also address the determination of the liability of an electric power company.

*Rodela v. Southern California Edison Company,* (1957) 148 Cal.App.2d 708, 307 P.2d 436 involved an action brought against the power company when a pole crashed through the top of the building where the plaintiff worked. The unlikely circumstances surrounding the incident involved the slow burning of the utility pole by heat emerging from the building's vent pipe which was in close proximity to the pole. Eventually the pole collapsed and fell through plaintiff's place of employment, injuring her. She argued that the defendant utility was negligent in failing to perform the duty of foreseeing such an accident. *Rodela, supra,* at 441. The trial court disagreed, and the appellate court upheld its view, stating:

"The defendant was entitled to assume that others would exercise reasonable care in the management of their own property and could properly continue to do so until apprised in some manner that such reliance was no longer reasonably safe."

*Id.*

A similar "freak" accident occurred in *Lea v. Carolina Power and Light Company,* (1957) 246 N.C. 287, 98 S.E.2d 9. The plaintiff received an electric shock when she touched the water spigot in her home. The spigot was connected to a water line; a tree cut by a stranger fell on the electric utility line and the wires leading into the plaintiff's home were somehow damaged, thereby causing the electric shock.

While discussing the misapplication of the res ipsa loquitur doctrine to this case, the North Carolina Supreme Court declared that "a power company is not required to anticipate negligence on the part of others". *Lea, supra,* at 13. *See also Alford v. Washington,* (1953) 238 N.C. 694, 78 S.E.2d 915; *Wood v. Carolina Telephone & Telegraph Co.,* (1948) 228 N.C. 605, 46 S.E.2d 717.

As stated above, no authorities have been cited, and we have found none, either in Indiana or elsewhere, which limit the rule concerning the anticipation of negligence to only a contributory negligence situation. In the instant case, REMC presented evidence that the electric line had been in the same place for a number of years and was not dangerously defective and that in previous years significantly smaller temporary stands had been erected out of reach of the power wires. REMC had not been notified of the higher and wider temporary bleachers that were installed in 1979 which created the hazard, and a representative of the utility had even inspected the premises a few days before the injury. Under these circumstances, REMC was entitled to an instruction that it had no duty to foresee and anticipate that Elrod, at Raceway's instruction, would build bleachers for Raceway's customers to within two feet of the power line. To hold otherwise would create an intolerable burden upon a utility and force it to constantly police its power lines in order to make certain the public is not in dangerous proximity to the lines. We believe the question is, in its final analysis, one of reasonable foreseeability. As stated by Prosser, there may be certain fact-specific instances under which a defendant must anticipate and foresee the negligence of third parties and guard against it. In our opinion, under these particular facts, this is not one of those instances.

*Issue No. II. Unavoidable Accident*

■ The court gave REMC's tendered instruction number 4:

"You are instructed that the duty imposed upon the defendant, Hendricks County R.E.M.C. does not require it to use every possible precaution to avoid damage to the plaintiff; nor does the duty imposed by law require that the defendant, Hendricks County R.E.M.C., should have employed any particular means, which it may appear after the accident would have avoided; nor was the defendant required to make accidents impossible. The question for you to determine from the evidence is not whether

the accident to the plaintiffs might have been avoided if the defendant, Hendricks County R.E.M.C., had anticipated its occurrence, but whether, taking all of the circumstances as they existed just before or at the time of the accident, the defendant was guilty of negligence in the operations of its business as an electric distribution utility to anticipate and guard against the accident involving the plaintiffs."

Pilkingtons argue that the above instruction is a "pure accident instruction" of the type disapproved in *Dunlap v. Goldwin,* (1981) Ind.App., 425 N.E.2d 724 and *Miller v. Alvey,* (1965) 246 Ind. 560, 207 N.E.2d 633. Plaintiff-appellants objected to the use of non-liability verbiage in REMC's instruction, stating that it contravened *Dunlap, supra,* which held that reversible error is found "if the instruction speaks to the issue of liability and in substance describes liability in terms of a mere accident". *Id.* at 726.

In *Gambill v. Lewis,* (1949) 227 Ind. 455, 85 N.E.2d 629, a sudden peril case, the court held that refusal to give an instruction that contained language that the duty imposed upon a defendant did not require her to use every possible precaution to avoid injury to the plaintiff, nor employ any particular means, nor make the accident impossible was reversible error. *Chase v. Settles,* (1970) 148 Ind.App. 259, 265 N.E.2d 57, approving an instruction nearly identical to REMC's instruction number 4, stated that the principle is not restricted to sudden peril cases but applies with equal force to any consideration of allegedly negligent conduct. Conversely, *Miller* disapproved a "pure accident" instruction totally dissimilar to the instruction here, in *Chase,* or in *Gambill:* the rejected instruction in *Miller* actually defined a "pure accident". *Dunlap* involved an instruction which said that "an owner of a swimming pool is *not an insurer* of the safety of users ... nor is he required to maintain a pool which is *accident proof...*". (Emphasis added). The 2nd district held that the emphasized phras-

es tainted the instruction, and, under *Miller*, constituted reversible error. On transfer, *Dunlap* was dismissed without action. *Chase* and *Gambill* have not been overruled. We believe *Dunlap* is distinguishable from *Chase, Gambill* and the case at bar by the phrases and word usage.

■ Pilkingtons further argue that the instruction upheld by the *Chase* court also included the following language which the instant instruction does not contain:

"The defendant was only required to use such precautions to prevent the accident and subsequent injuries as would have been adopted by an ordinary prudent person under the circumstances as they appeared immediately prior to the accident."

This contention was not part of their objection to the instruction and is waived. *English Coal Company, Inc. v. Durcholz*, (1981) Ind.App., 422 N.E.2d 302. In addition, such language was contained in other instructions. We find no error here.

*Issue III: Constant Surveillance*

Pilkingtons next contend that the trial court erred in giving REMC's instruction number 7 and in failing to give plaintiff-appellant's instruction number 5 to the jury.

The controversy surrounds the second half of REMC's instruction number 7, which states that the duty of REMC to inspect its utility lines does not require it to keep the lines under constant surveillance.

Pilkingtons aver that the "constant surveillance" provision is not a correct statement of Indiana law, and that by instructing jurors that there is no requirement of constant surveillance, the instruction invades the province of the jury.

■ Electric utilities have a common law duty to exercise reasonable care to keep distribution and transmission lines safely insulated in places where the general public may come in contact with them. *Petroski v. Northern Indiana Public Service Co.*, (1976) 171 Ind.App. 14, 354 N.E.2d 736. *See Hedges v. Public Service Company of Indiana, Inc.*, (1979) Ind.App., 396

N.E.2d 933; *Jones v. City of Logansport*, (1982) Ind.App., 436 N.E.2d 1138. This duty of care is codified by the National Electric Safety Code (Code), which prescribes the minimum standards for electric utilities in Indiana. *Holding v. Indiana & Michigan Electric Co.*, (1980) Ind.App., 400 N.E.2d 1154. The Code provision regarding inspection requires that "[l]ines and equipment shall be inspected from time to time at such intervals as experience has shown to be necessary." According to the testimony of Thomas Allender, assistant coordinator of REMC, it is the standard of the utility industry to inspect the power lines every three to five years; in addition, the meter reader watches for hazards on a routine monthly basis along with carrying out the rest of his duties.

■ While we discovered no Indiana case law which outlines an electric utility's standard of care that employs "no requirement of constant surveillance" language, we believe that this language is a direct corollary of the Code's provision for inspection of the lines "from time to time ... as experience has shown to be necessary". Certainly it is a matter of reason that the utility's duty to exercise reasonable care does not contemplate round-the-clock supervision of each and every place where the public may come into contact with power lines. Decisions in other jurisdictions have directly endorsed the conclusion that the duty of reasonable care does not contemplate constant surveillance. *Taylor v. United States*, 360 F.2d 488 (4th Cir.1966), cert. denied, 386 U.S. 988, 87 S.Ct. 1298, 18 L.Ed.2d 332 ("The duty of the government to make inspections [of transformer] ... does not include constant surveillance"); *Dunnaway v. Duquesne Light*, 423 F.2d 66 (3rd Cir.1970) (citing *Reed, infra.*); *Reed v. Duquesne Light*, (1946) 354 Pa. 325, 47 A.2d 136 ("with the lines properly and safely installed and maintained, there was no duty of continuing inspection upon the light company"); *Luketich v. Duquesne Light*, (1957) 389 Pa. 87, 132 A.2d 268 (citing *Reed, supra*).

Plaintiff-appellants also urge that the trial judge erred in not giving their instruction number 5 to the jury. It is sufficient for our discussion to state that number 5 deals with both the Hendricks County REMC's duty to properly insulate its power lines when the public may come into contact with them and its duty to inspect for potentially hazardous conditions. As we stated in *Hedges, supra,* Pilkingtons' argument concerning the exclusion of number 5 is "little more than [an] unsupported assertion that their instruction [is] preferable to those given by the trial court". *Id.* at 937. Plaintiff-appellants' own instruction 18, 19, and 20 adequately convey the subject of number 5; the inclusion of 5 would have been merely superfluous. A court's refusal to give a certain tendered instruction is not error when the contents of the instruction are fully covered by other instructions given. *Steiner v. Goodwin,* (1966) 138 Ind.App. 546, 215 N.E.2d 361.

We find no error here.

*Issue IV. Excuse or Justification*

The court gave as one of its final instructions to the jury, REMC's tendered instruction number 3A:

"You are instructed although it is the custom in utility industry to follow the provisions of the National Electric Safety Code, Hendricks County R.E.M.C. is justified and excused from not following the provisions of the Code if the R.E.M.C. did not know nor in the exercise of reasonable care could have known that the provisions of the National Electric Safety Code were violated."

Plaintiff objected at trial to the giving of this instruction, as follows:

"By Mr. Doehrman: ... Plaintiff would object to the giving of this instruction for the reason that it's not the law in the State of Indiana to the extent that the National Electric Safety Code, there is evidence in the record concerning the R.E.M.C.'s duty to inspect the wires and plaintiff can think of no circumstances under which they would be relieved of that duty to inspect the wires and there

certainly could be no justification or excuse for their not inspecting the wires and I think to the extent that this instruction tells the jury that, that it's misleading and contrary to the law and, therefore, should not be given...

... The provisions—the instruction indicates follow the provisions of the National Electric Safety Code. One of the provisions in evidence deals with clearances and their duty to guard from accidental touching by the public and I think as far as this instruction addresses that provision, it is appropriate but as far as it addresses the provision concerning inspection which is a different and separate duty of responsibility under the Code, I don't think the instruction addresses that and for that reason I think it's inappropriate."

In their brief, Pilkingtons argue:

1. The instruction confuses custom, statute and ordinances.

2. Justification or excuse may rebut the presumption of negligence but does not remove negligence from the case.

3. Justification or excuse could not apply to the facts of this case because to rebut the presumption of negligence, one must show compliance was impossible or non-compliance was excusable because of circumstances resulting from causes or things beyond one's control and in no way produced by one's own negligence. The facts of the instant case do not show this.

4. Instruction is unintelligible because of grammatical errors.

5. Instruction conflicts with plaintiff's instruction number 20.

 Ind.Rules of Procedure, Trial Rule 51 provides that "no party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider the verdict, stating distinctly the matter to which he objects and the grounds of his objection". Failure to object specifically to certain language precludes raising such objection on appeal. *English Coal*

*Company v. Durcholz,* (1981) Ind.App. 422 N.E.2d 302; *McDonald v. State,* (1976) 264 Ind. 477, 346 N.E.2d 569. An objection to an instruction merely on the grounds that it is an improper statement of the law or highly prejudicial is inadequate. *Whitten v. State,* (1975) 263 Ind. 407, 333 N.E.2d 86. An objection that an instruction does not state a correct principle of law or is confusing and misleading preserves nothing for review. *City of Indianapolis v. Ervin,* (1980) Ind.App., 405 N.E.2d 55.

■ Pilkingtons' objection to instruction 3A is vague and general. It merely states that the instruction does not state the law, is misleading, inappropriate, and does not address the duty of inspection. Pilkingtons attempt, in their brief, to raise an entirely new and more specific set of objections. This they cannot do. They have waived this issue.

*Issue V: Liability of Property Owner*

■ Pilkingtons contend that the trial court committed error in failing to give their instruction number 13, which states, "[T]he mere fact a person is injured on the property of another does not render the property owner liable". Apparently the impetus behind the tender of this instruction is to counter what Pilkingtons believe is defendant-appellees' attempt to bring Raceway Park and Hot Rod in as "silent defendants". Pilkingtons point out many instances in which REMC and Elrod made reference to the culpability of Raceway and Hot Rod, and they include a lengthy excerpt from REMC's opening statement in their brief to illustrate their charge.

Plaintiff-appellants accurately state that reversible error occurs when the trial court refuses to give a tendered instruction that is a correct statement of the law, is applicable to the facts of the case, and is not adequately covered by other instructions given. *Eagle Motor Lines, Inc. v. Galloway,* (1981) Ind.App., 426 N.E.2d 1322. However, it is our opinion that the proffered instruction is both inapplicable to the facts of this case and adequately covered by other instructions.

■ The proposed instruction is actually a defendant property owner's instruction which is used when a person is injured on the owner's premises, not a plaintiff's instruction. While Pilkingtons cite *Fort Wayne National Bank v. Doctor,* (1971) 149 Ind.App. 365, 272 N.E.2d 876, as authority for their tendered instruction, we note that *Doctor* is a wrongful death action against the owner of a premises and is vastly different from the case at hand. As Elrod points out, Pilkingtons fail to cite any authority to support their contention that the trial court should give a jury instruction relating to the liability of a property owner when neither defendant in the case was the owner of the property on which plaintiff-appellants' injury occurred. (Defendant-appellee Elrod's brief, p. 11). The tendered instruction is simply inapplicable to the facts of this case.

Further, the subject of the instruction is adequately covered by at least one other instruction. The trial court gave Pilkingtons' instruction number 15 to the jurors which admonished them that they were not to concern themselves with the reason why Raceway and Hot Rod were not parties to this action. The instruction then explained to the jury that "the fact that they [Raceway and Hot Rod] are not parties to this action has no effect on the liability or freedom from liability of REMC or Jack Elrod." We believe that this instruction adequately addresses the "silent defendant" problem.

There was no error in the failure to give plaintiffs' tendered instruction number 13.

*Issue VI: The Exhibit*

Pilkingtons allege the trial court abused its discretion in admitting Elrod's Exhibit B, a sketch showing an assumed deflection of a utility pole if it was moved two inches at three feet above the ground. The exhibit demonstrates that a two-inch deflection at the bottom of the utility pole results in a one foot, seven-inch movement at the top of the pole.

Plaintiff-appellants objected to the admission of Exhibit B on the ground that

there was neither any evidence introduced as to the deflection or movement of the pole nor any evidence that the guy wires holding the pole in question had been damaged. Thus, Pilkingtons contend, the admission of a sketch showing an assumed deflection of the pole amounted to pure speculation. This objection was overruled by the trial court.

When reviewing the correctness of the trial court's ruling, we are bound by an extremely limited standard of review as the admissibility of evidence is within the sound discretion of the trial court. *Rust v. Guinn*, (1982) Ind.App., 429 N.E.2d 299, citing *Tapp v. State*, (1980) Ind.App., 406 N.E.2d 296. "This court will reverse a trial court for abuse of that discretion only when the trial court's action is clearly erroneous and against the facts and circumstances before the trial court or reasonable inferences to be drawn therefrom." *Rust, supra,* at 305. Hence, evidence may be found to be relevant although its ability to persuade is extremely light. *Smith v. Crouse-Hinds*, (1978) 175 Ind.App. 679, 373 N.E.2d 923, citing *Spears v. Aylor*, (1974) 162 Ind.App. 340, 319 N.E.2d 639. In the instant case, the weight of the evidence was to be determined by the jury. *Spears, supra,* at 641.

Demonstrative evidence is evidence offered for the purposes of illustration and clarification. The theory justifying admission of this type of exhibit "requires only that the item be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact." McCormick, *Evidence*, Sec. 212, at 528 (1972).

Elrod's theory of the case was based on the assertion that the location of the power line had altered between the date Elrod's company had erected the bleachers (August 27) and the date the accident occurred (September 3). Two of the crew testified that they did not see any electric power lines near the bleachers while the other two workers recalled that the line was out of reach. Other witnesses testified that they did not observe the wire in such close prox-imity before the occurrence. Jack Elrod stated unequivocally that his company could not have installed the bleachers had the power line been as close as it was on September 3rd. Thus, evidence such as the sketch which illustrated that a small movement at the bottom of the utility pole would result in a perceptibly large movement at the top of the pole is relevant.

In their brief, Pilkingtons argue further that the exhibit lacked an adequate foundation and was misleading and confusing to the jury. (Appellants' brief, pg. 43). On review, however, a party is limited to the specific objections that were originally made at trial. *Riechmann v. Reasner*, (1943) 221 Ind. 628, 51 N.E.2d 10. One may not later raise new objections. *Id.*

Nevertheless, we note in passing that the admissibility of demonstrative evidence depends on the establishment of a proper foundation by the party offering the evidence. *Rust, supra,* at 306. (Citations omitted).

The determination of the adequacy of the foundation is, as usual, within the sound discretion of the trial court. *Id.* Elrod testified that he has training in mathematics and is familiar with tangents, angles, and measurements to determine the result of the assumed deflection of the utility pole. We cannot say that the trial court abused its discretion in determining that a proper foundation for the sketch was laid.

To support its contention that the sketch was misleading and therefore inadmissible, Pilkingtons refer us to *Smith v. Crouse-Hinds, Inc., supra,* as authority for the proposition that counter-balancing factors, one of which is that the evidence is confusing or misleading the jury, may cause the court to exclude relevant evidence because the probative value of the evidence is outweighed by the prejudicial effect of the factors. *Id.* 373 N.E.2d at 926. Pilkingtons argue that the mathematical calculations used in the exhibit duped

the jury into believing that actual evidence of deflection existed.

It is our opinion that the hypothetical nature of the sketch was clearly understood by the jury upon its admission as an exhibit. The likelihood that the jury was misled did not outweigh the probative value of the exhibit. The trial court did not err in admitting Elrod's Exhibit B into evidence.

For the above reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON and RATLIFF, JJ., concur.