**PALMER & SONS PAVING, INC.,** Joel Bullard d/b/a Chesterton Terrace Apartments, Appellants–Defendants,

and

David Russell, Cindy Russell, Donald Wilson, Chrissy Wilson, Betty Schultz, Terry Bullock, Judy Graves, Darlene Graves, David Wallace, Jennifer Wallace, Illinois Farmers Insurance Company, as Subrogee of Robert Peterson, Appellants–Plaintiffs,

v.

**NORTHERN INDIANA PUBLIC SERVICE COMPANY,** Appellee–Defendant.

No. 64A04–0101–CV–7.

Court of Appeals of Indiana.

Nov. 15, 2001.

Renee J. Mortimer, Michael T. Terwilliger, Hinshaw & Culbertson, Munster, Indiana, Attorneys for Appellant, Palmer & Sons Paving, Inc.

Paul A. Rake, John M. McCrum, Scott B. Cockrum, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellee, Northern Indiana Public Service Company.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Palmer & Sons Paving, Inc. (Palmer), appeals the trial court's grant of Appellee–Defendant's, Northern Indiana Public Service Company (NIPSCO), motion for summary judgment.

We reverse.[1]

### ISSUE

Palmer raises two issues on appeal, one of which we find dispositive and restate as follows: whether the trial court erred in granting NIPSCO's motion for summary judgment.

### FACTS AND PROCEDURAL HISTORY

On September 9, 1996, Palmer began repaving the parking lot of the Chesterton Terrace Apartments in Chesterton, Indiana. The parking lot spanned an area in the middle of four apartment buildings with a utility shed located near its center. This shed contained gas equipment owned by NIPSCO. The gas equipment consisted of a gas meter, a gas regulator, and the piping and valving necessary to connect the regulator to the gas meter and the meter to the customer-supplied fuel line.[2]

The shed had a vent pipe attached to the regulator that extended through the exterior east wall of the shed by about six inches. The shed also served as a storage area for the apartments' maintenance items, such as lawn and garden equipment.

Rodney Palmer operated the paving machine for Palmer. At some point, Rodney backed the paving machine into the vent pipe. As a result of the contact between the paving machine and the vent pipe, gas pressure passed from the main directly into Bullard's piping without being reduced. Gas then entered the tenants' apartments, over-pressurizing stove pilot lights in the apartments and igniting a fire in one of the apartment buildings. After the incident, NIPSCO, at its sole expense, moved the gas equipment from the shed to the individual apartment buildings.

On December 12, 1996, David and Cindy Russell filed a complaint against Palmer and Bullard, individually and d/b/a Chesterton Terrace Apartments, to recover property damage on theories of negligence. On April 10, 1997, the trial court consolidated four other cases brought by tenants of Chesterton Terrace. NIPSCO was named as a defendant in each of these complaints filed in late January and early February 1997. On August 1, 1997, all tenant plaintiffs with pending claims filed one amended complaint, naming as defendants NIPSCO, Bullard, individually and d/b/a Chesterton Terrace Apartments, and Frank Palmer, individually and d/b/a Palmer. On May 19, 1998, another tenant was added as a plaintiff in plaintiffs' second amended complaint. Illinois Farmers

---

1. Oral argument was held in this case on October 18, 2001, in Indianapolis.

2. The shed also housed gas piping owned by Joel Bullard (Bullard), the owner of the apart-

ment complex, which was connected by a valve to NIPSCO's meter assembly. The reduced gas was delivered to the tenants' apartments through Bullard's own piping.

Insurance Company, as subrogee of a tenant of Chesterton Terrace, filed a complaint against the defendants. This complaint was eventually ordered consolidated with the remaining cases on February 9, 1999.

Bullard, as owner of Chesterton Terrace Apartments, filed a complaint against Palmer and NIPSCO on October 30, 1998. On May 9, 2000, Bullard, as a plaintiff, offensively filed a motion for summary judgment to establish liability against Palmer. Most, if not all, of the remaining plaintiffs joined in that motion. On June 15, 2000, NIPSCO filed a motion for summary judgment. On September 30, 2000, Palmer filed a response opposing all pending motions for summary judgment. On November 13, 2000, NIPSCO filed a reply in support of its motion for summary judgment.

On November 17, 2000, the parties' respective motions were heard by the trial court. On December 13, 2000, the trial court denied Bullard's motion for summary judgment, and it granted NIPSCO's motion for summary judgment. ·

Palmer now appeals. Additional facts will be supplied as necessary.

### DISCUSSION
#### I. Summary Judgment ·

Palmer argues that the trial court erred in granting NIPSCO's motion for summary judgment. Specifically, Palmer argues that the evidence shows that NIPSCO was aware of incidents involving contact with the shed and its contents prior to the incident in question. Palmer insists that NIPSCO did nothing to protect the vent pipe and gas system from impact and did nothing to warn individuals of its presence and potential danger of impact.

#### A. Standard of Review

■ The standard of review when reviewing a grant or denial of summary judgment is well-settled. Our standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Miller v. Grand Trunk Western R.R., Inc.*, 727 N.E.2d 488, 491 (Ind.Ct. App.2000). We must consider the pleadings and evidence designated pursuant to Ind. Trial Rule 56(C) without deciding their weight or credibility. *Id.* Summary judgment should be granted only if such evidence shows that there is no genuine issue of material fact and that judgment is warranted as a matter of law. *Id.*

#### ·B. Duty

■ Unless there is a duty owed by one person to another, there can be no negligence. *Bush v. Northern Indiana Public Service Co.*, 685 N.E.2d 174, 177 (Ind.Ct.App.1997), *reh'g denied, trans. denied.* In determining whether NIPSCO owed a common law duty to the tenants of Chesterton Terrace, we must consider three factors: " '(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns.' " *Id.* (quoting *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991), *reh'g denied*): This inquiry is a question of law. *Id.*

#### 1. Relationship Between the Parties

Palmer maintains that an analysis of the factors listed above reveals that there is evidence sufficient to create an issue of fact on NIPSCO's duty to the tenants of Chesterton Terrace. Palmer contends that the first component of duty, the relationship between the parties, was present between NIPSCO and the tenants of Chesterton Terrace.

The duty of a utility to use reasonable care in the distribution of gas is imposed by law because the utility conveys a dangerous instrumentality. *South Eastern Indiana Natural Gas Co., Inc. v. Ingram*, 617 N.E.2d 943, 951–952 (Ind.Ct. App.1993). Furthermore, a gas company has a duty to use reasonable care in operating its lines so as to prevent the escape of gas in such quantities as to become dangerous to life and property. *Westfield Gas Corp. v. Hill*, 131 Ind.App. 558, 570, 169 N.E.2d 726, 733 (1960).

NIPSCO notes, and we agree, that under Indiana law on premises liability, no duty is imposed upon one not in control of the premises. *Kahf v. Charleston South Apartments*, 461 N.E.2d 723, 731 (Ind.Ct.App.1984), *reh'g denied, trans. denied.* While NIPSCO maintains that it had no control over the shed, we find that the facts are in dispute as to this issue.

NIPSCO points out that its customer was Bullard. As landlord, Bullard purchased NIPSCO's gas and then supplied it to his tenants through his own lines, which extended from the single regulator in the shed in the middle of the parking lot and into each apartment. On a monthly basis, NIPSCO issued one bill to Bullard, as the owner of the apartment complex. Thus, NIPSCO maintains that because the tenants of the apartment complex purchased its gas from Bullard through their lease, they had no customer-utility relationship with NIPSCO.

NIPSCO also argues that the tenants' use of the parking lot to park their cars was not a use that created a relationship. NIPSCO maintains that nothing about the tenants' use of the parking lot jeopardized the shed or the configuration of the gas equipment utilized for central metering to Bullard. Thus, NIPSCO insists that the tenants parking nearby had no relationship to the activities of the utility or its equipment.

Finally, NIPSCO argues that the sole relationship giving rise to a duty to the claimants in this case stems from the contract between Bullard and Palmer. NIPSCO asserts that it was the contractual relationship, and performance of the contract, which exposed the claimants to any foreseeable risk of harm. Neither Bullard nor Palmer gave notice to NIPSCO that paving work was to occur or that it would take place near the utility shed. Nor did Palmer seek any assistance from NIPSCO as to how its work should be performed.

NIPSCO makes several valid arguments on this issue. However, NIPSCO cannot escape the fact that it can also be argued that it had some degree of control over the shed. Representatives from NIPSCO possessed keys to the shed. As a result, it had unrestricted access to the shed. Additionally, there is evidence that NIPSCO exercised control over its equipment in the shed, as demonstrated by its relocation of this equipment after the fire, at its sole expense. Further, as stated above, NIPSCO has a duty to use reasonable care in operating its lines so as to prevent the escape of gas in such quantities as to become dangerous to life and property. *See Westfield Gas Corp.*, 169 N.E.2d at 733. There is evidence that, prior to September 9, 1996, NIPSCO was notified that vehicles in the parking lot had hit the shed. In fact, NIPSCO representatives came to Chesterton Terrace to inspect the damage done to the shed by vehicles in the parking lot. Thus, NIPSCO had notice that the shed was in danger of being struck, but it took no active steps to curtail the danger.

Accordingly, in our determination of whether NIPSCO owed a common law duty to the tenants of Chesterton Terrace,

we find that the relationship between the parties component was present.

## 2. Foreseeability

■ Next, Palmer argues that the foreseeability component of duty was present between NIPSCO and the tenants of Chesterton Terrace. In *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind.1991), *reh'g denied*, our supreme court held:

In analyzing the foreseeability component of duty, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. "The duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty." Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm. Thus, part of the inquiry into the existence of a duty is concerned with exactly the same factors as is the inquiry into proximate cause. Both seek to find what consequences of the challenged conduct should have been foreseen by the actor who engaged in it. We examine what forces and human conduct should have appeared likely to come on the scene, and we weigh the dangers likely to flow from the challenged conduct in light of these forces and conduct.

*Id.* (citations omitted).

In the instant case, Palmer argues that it was reasonably foreseeable that a vehicle in the ordinary course of travel would come into contact with the vent pipe. NIPSCO did not place barricades around the shed, nor did it do anything to protect the shed and its contents, including the vent pipe, from impact and/or damage. Moreover, NIPSCO did not place any signs on or about the shed to identify the vent pipe and/or to warn individuals of the fact that gas equipment was present.[3] NIPSCO did nothing to warn the public of the dangerous condition that could result if an impact to the vent pipe, the shed and/or gas equipment occurred.

Additionally, in his affidavit, Allen Houghtaling (Houghtaling), a former maintenance worker at the Chesterton Terrace Apartments, stated, in pertinent part, as follows:

9. Prior to September, 1996, I witnessed vehicles make contact with the shed in the middle of the parking lot.

10. Prior to September, 1996, I often had to fix and repaint the shed, as a result of vehicles making contact with the shed.

11. Prior to September, 1996, I became concerned about the gas equipment that was located in the shed in the middle of the parking lot.

12. Prior to September, 1996, I contacted Northern Indiana Public Service Company (NIPSCO) and had their representatives/employees come to the Chesterton Terrace Apartments to look at the gas equipment that was located in and about the shed.

13. Prior to September, 1996, NIPSCO representatives/employees came to the Chesterton Terrace Apartments at my request.

14. Prior to September, 1996, I advised the NIPSCO representatives/employees

---

**3.** On the shed and above the vent pipe, a standard "STOP" sign was posted for vehicular safety. There was also a sign posted beneath the "STOP" sign that read "SLOW 5 M.P.H." In his deposition, Michael Simpson, apartment manager, explained that the traffic signs on the shed were to control the movement of cars traveling east and west along the north side of the shed, so as to avoid pedestrian accidents.

when they came to the Chesterton Terrace Apartments that the shed had been hit by vehicles in the parking lot.

15. Prior to September, 1996, when the NIPSCO representatives/employees were at the Chesterton Terrace Apartments at my request, I showed the NIPSCO representatives/employees the damage on the shed that I had to fix that resulted from vehicles hitting the shed that was in the middle of the parking lot.

16. Prior to September, 1996, when the NIPSCO representatives/employees were at the Chesterton Terrace Apartments at my request, I told them that I thought it was dangerous to have the gas equipment in the shed in the middle of the parking lot.

(Appellant's Appendix at 345).

On the other hand, NIPSCO argues that foreseeability would only require it "to anticipate the ordinary and normal use" of the parking lot. *Bush,* 685 N.E.2d at 178. Further, NIPSCO is not required to guard against the reckless conduct of others. *Id.* With this in mind, NIPSCO asserts that even with Houghtaling's affidavit, there is no evidence that the vehicles that made contact with the shed prior to September 1996 caused any damage to NIPSCO's vent pipe or gas meter assembly, and, thus, there is no evidence that such episodes resulted in a conflagration involving the apartments. In fact, NIPSCO contends that the only thing established by the undisputed evidence is that, for many years, normal vehicular traffic never produced such damage and that even vehicular collisions with the utility shed were not sufficient to cause the harm complained of here.

We are not persuaded by NIPSCO's argument. NIPSCO would like this court to believe that because no other fires involving the Chesterton Terrace Apart-

ments occurred due to people hitting the shed with their vehicles, the incident that occurred on September 9, 1996 was not foreseeable. As previously stated, a utility has a duty to use reasonable care in the distribution of gas, because the utility conveys a dangerous instrumentality. *South Eastern Indiana Natural Gas Co., Inc.,* 617 N.E.2d at 951–952. The shed contained gas equipment. NIPSCO had notice that vehicles, on occasion, hit the shed. Because NIPSCO was aware that vehicles hit the shed, we find that it was reasonably foreseeable that a vehicle, or some other moving object, could hit the vent pipe attached to the shed and lead to the type of harm that occurred here.

Consequently, in our determination of whether NIPSCO owed a common law duty to the tenants of Chesterton Terrace, we find that the foreseeability component was present.

### 3. Public Policy

■ Palmer next argues that the public policy component of duty was present between NIPSCO and the tenants of Chesterton Terrace. In *Indiana Limestone Co. v. Staggs,* 672 N.E.2d 1377, 1384 (Ind. Ct.App.1996), *trans. denied,* this court held that public policy weighs in favor of imposing a duty upon owners of property containing hazards when such hazards are located near places on public ways where users of the road might foreseeably deviate from it. Similarly, Palmer maintains that public policy favors the imposition of a duty on the part of NIPSCO. NIPSCO owned the vent pipe and other gas equipment in the shed. Prior to September 1996, Houghtaling informed NIPSCO that he witnessed vehicles make contact with the shed. Despite this knowledge, NIPSCO failed to protect and identify the gas equipment, including the vent pipe. Thus, Palmer argues that public policy weighs in favor of imposing a duty upon NIPSCO, as

NIPSCO was in a position to protect the tenants of Chesterton Terrace, but it failed to do so.

However, NIPSCO argues that public policy does not weigh in favor of imposing a duty upon it. NIPSCO maintains that it is a matter of reason that the utility's duty to exercise reasonable care does not contemplate round-the-clock supervision of each and every place where the public may come into contact with gas equipment. *See Pilkington v. Hendricks County Rural Elec. Membership Corp.*, 460 N.E.2d 1000, 1007 (Ind.Ct.App.1984). NIPSCO insists that this is especially true in regard to activities over which it had neither knowledge nor control.

Although public policy is not the pivotal factor in this case, we find that NIPSCO's ownership of the vent pipe and the gas equipment in the shed, coupled with its knowledge of people hitting the shed with their vehicles, made it reasonably foreseeable to NIPSCO that users of the parking lot might deviate from the normal course of the travel and hit the shed and/or vent pipe. *See Indiana Limestone Co.*, 672 N.E.2d at 1384. Under these circumstances, public policy favors imposition of a duty. Therefore, in our determination of whether NIPSCO owed a common law duty to the tenants of Chesterton Terrace, we find that the public policy component was present.

### C. Proximate Cause

■■ Finally, with respect to its argument for reversal of the trial court's grant of NIPSCO's motion for summary judgment, Palmer argues that NIPSCO was not entitled to judgment as a matter of law on the issue of proximate cause. "[P]roximate cause is generally an issue for the trier of fact and may be decided as a matter of law only when the facts are undisputed and lead to but a single inference of [sic] conclusion." *Thiele v. Faygo*

*Beverage, Inc.*, 489 N.E.2d 562, 576 (Ind. Ct.App.1986), *reh'g denied, trans. denied.* Palmer insists that the facts are in dispute.

Palmer argues that there is evidence that if NIPSCO would have identified, by signage or otherwise, the presence of gas equipment in the shed, it would have used an alternate method of paving, which would have prevented the accident. Furthermore, Palmer asserts that there is evidence that if NIPSCO would have protected the shed and its contents, including the vent pipe, from impact, such as with barricades, the accident would not have occurred. Accordingly, Palmer maintains that there is evidence that NIPSCO's actions caused or contributed to the tenants' damages.

On the other hand, NIPSCO argues that, as a public utility, it cannot be held to globally foresee and anticipate the negligent activity of contractors near its facilities. "The policy underlying proximate cause is that we, as a society, only assign legal responsibility to those actors whose acts are closely connected to the resulting injuries, such that imposition of liability is justified." *Straley v. Kimberly*, 687 N.E.2d 360, 364 (Ind.Ct.App.1997), *reh'g denied, trans. denied.* NIPSCO maintains that its acts were not closely connected to the resulting injuries. Moreover, NIPSCO argues that absent specific notice of Palmer's repaving project at the apartment complex, it had no reason to anticipate such an accident, *i.e.* the fire.

Although NIPSCO did not have specific notice of Palmer's repaving project at Chesterton Terrace, it did have specific notice of vehicles hitting the shed. Additionally, because we are unable to predict what would have happened had there been barricades around the shed or signs posted on the shed, we cannot rule out the possibility that the September 9, 1996 incident could have been avoided. Thus, we cannot

find that the facts are undisputed and lead to but a single inference or conclusion. *See Thiele*, 489 N.E.2d at 576.

### CONCLUSION

Based on the foregoing, we find that there are genuine issues of material fact. *See Miller*, 727 N.E.2d at 491. Therefore, we conclude that the trial court erred in granting NIPSCO's motion for summary judgment.

Reversed.

SHARPNACK, C.J., and NAJAM, J., concur.