## AMERICAN INTERNATIONAL ADJUSTMENT CO., Plaintiff–Appellee, Cross–Appellant,

v.

## Frank J. GALVIN, Jr., and Galvin, Stalmack and Kirschner, Defendants–Appellants, Cross–Appellees.

### Nos. 95–1966, 95–2089.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 27, 1995.

Decided June 20, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 1, 1996.

David C. Jensen, argued, Frederick H. Link, Michael E. O'Neill, Eichhorn & Eichhorn, Hammond, IN, for Frank J. Galvin, Jr. and Galvin, Stalmack & Kirschner.

Robert P. Vogt, argued, William G. Stone, James R. Branit, Susan L. Hartman, Bullaro, Carton & Stone, Chicago, IL, for American Intern. Adjustment Co.

Before POSNER, Chief Judge, BAUER, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

Frank J. Galvin, Jr. and his law firm ("Galvin") appeal a legal malpractice judgment entered after a jury trial. Actually, Galvin appeals the final judgment as well as certain summary judgments entered by the district court prior to trial. The appellee and cross-appellant, American International Adjustment Company ("AIAC"), appeals the district court's order of remittitur which reduced the damage award from $1,250,000 to $1,000,000. To summarize our conclusions in advance: we reverse the judgment entered against Galvin and remand for a new trial. However, we affirm the district court's elimination of contributory negligence as a defense to AIAC's legal malpractice claim. Given these conclusions, AIAC's cross-appeal is moot.

BACKGROUND

■ This diversity, legal malpractice action arose out of a personal injury lawsuit. In 1989, a Tri–State Transport Company truck ran into Virginia Dickinson's car, seriously injuring Ms. Dickinson. Ms. Dickinson never left the hospital and died of a pulmonary embolism a month after the accident. Prior to her death, she filed suit against TriState, which retained Galvin as legal counsel.[1] Dickinson's two-count complaint raised alternative claims, seeking damages under both the Indiana survival statute, Ind.Code 34–1–1–1, and the Indiana wrongful death statute, Ind.Code 34–1–1–2. Under Indiana law, Tri–State could be liable under **either** statute but not both. If the victim had died from the accident, the case was for wrongful death. If the victim died from unrelated causes, the case was a survival action. The distinction is important because each statute

Robert P. Vogt, argued, James R. Branit, Bullaro, Carton & Stone, Chicago, IL, for American Intern. Adjustment Co. in No. 95–1966.

---

**1.** In May 1990, Tri–State tendered its defense to AIAC, its liability carrier.

allows for different recoveries. In a case governed by the survival statute, Ms. Dickinson's estate could receive full damages including pain and suffering. Under the wrongful death statute, the estate could recover only Ms. Dickinson's medical and funeral expenses plus any other pecuniary or other loss suffered by her survivors.

As any attorney would recognize from the above description, one significant pre-trial task for Galvin would be to ascertain the cause of death in the hopes of limiting his client's exposure. Most critically, if there were no evidence that Ms. Dickinson died from a cause other than Tri–State's negligence, then the case would be a wrongful death action and evidence of her pain and suffering would be inadmissible at trial.

This distinction became especially important to AIAC and Galvin because there was little doubt about Tri–State's liability. The trial would focus on damages, and the plaintiff had made a "day-in-the-life" video of Ms. Dickinson's last day and intended to offer it as evidence to show her pain and suffering. The full length video consisted primarily of Ms. Dickinson sleeping, but the version edited for trial focused on her periods of intense suffering. Galvin estimated prior to trial that if the case proceeded to the jury as a survival action, i.e. if the jury saw the videotape, the verdict would be around $2.5 million. If, however, it were solely a wrongful death case, the verdict would be closer to $850,000.

Normally, a defense attorney in Galvin's position would utilize various discovery tools to pin down the cause of death. Galvin might have served requests for admission and/or interrogatories on his opposing counsel, or deposed the treating physicians. Instead, on the eve of trial, he filed a "Motion in Limine" asking the district court to force the plaintiff to choose between the mutually exclusive theories of survival and wrongful death. Plaintiff's counsel responded that the cause of death was a question of fact that was for the jury. The district court pressed the plaintiff's lawyer about which theory the plaintiff would be pursuing at trial. The lawyer responded, "I haven't interviewed Dr. Walsh in depth, and I haven't interviewed

Dr. Kaufman in depth as to the [cause of death] and until they testify under oath, I honestly don't know what they're going to say." Possibly sensing a lack of candor in that response, the district court instructed plaintiff's counsel to report back the next day about what testimony he would present as to the cause of death. The next day however, the district court did not revisit its concerns because it ruled that it had no authority to force the plaintiff to elect one theory over the other.

Prior to trial, the district court opined that the case could be settled for $853,000. AIAC refused to budge from its last offer of $700,-000, and the case proceeded to trial. At trial, the plaintiff introduced the edited videotape—the fifteen worst minutes of Virginia Dickinson's last day. At the close of the plaintiff's case, Galvin moved for a directed verdict on the survival claim. Plaintiff's counsel acknowledged that he had not presented any competent medical testimony or expert testimony showing the cause of death to be anything but the accident, and the district court granted Galvin's directed verdict motion. The case went to the jury solely on the wrongful death count. However, Galvin did not ask the district court for a jury instruction precluding the jury's consideration of the videotape. The jury returned a verdict for the plaintiff in the amount of $2.6 million. The parties settled for $2.3 million with post-trial motions pending. This legal malpractice suit followed.

AIAC raised nine specific instances of alleged malpractice, the most significant of which was that Galvin failed to ascertain the cause of death prior to trial. AIAC contended that had Galvin done so, he could have obtained summary judgment on the survival claim and kept from the jury all evidence of pain and suffering, especially the videotape. The magistrate judge presiding over the malpractice trial granted partial summary judgment for AIAC, ruling that Galvin had breached his standard of care as a matter of law by failing to ascertain the cause of death. The judge permitted the causation and damages aspect of this claim to go to the jury. The court also allowed AIAC's other allegations, including Galvin's failure to object to

the plaintiff's opening statement and closing argument and Galvin's stipulation to the fact that TriState had 126 traffic accidents within a two-year period, to go to the jury. Finally, the magistrate judge precluded Galvin from presenting the defenses of incurred risk and contributory negligence. The jury returned a general verdict for AIAC of $1.25 million, which the court reduced to $1 million.

ANALYSIS

■ We review the district court's grant of summary judgment *de novo*, taking the record in the light most favorable to the non-movant. *Harris v. City of Marion, Ind.*, 79 F.3d 56, 58 (7th Cir.1996). Summary judgment is appropriate where there are no genuine disputes of material fact and where the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Although summary judgment is an effective tool for district courts to manage their caseload, they must avoid the temptation to use summary judgment "as an abbreviated trial." *Door Systems, Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 172 (7th Cir.1996).

■ To prove legal malpractice under Indiana law, a plaintiff must show: (1) employment of the attorney, (2) the attorney's failure to exercise ordinary skill and knowledge, and (3) damages to the plaintiff proximately resulting from that failure. *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind.App. 1 Dist.1991). In a typical legal malpractice case, the plaintiff must prove that "as a result of the lawyer's incompetence ... the client ... lost his case or paid a larger judgment than would have been awarded had the defendant performed competently." *Transcraft v. Galvin, Stalmack, Kirschner, & Clark*, 39 F.3d 812, 815 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1990, 131 L.Ed.2d 876 (1995). There are two components to evaluating Galvin's performance. First, whether he committed legal error is undoubtedly a question of law. 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice*, § 32.11 at 183 (4th ed.1996). Next,

whether that error amounted to negligence is normally a question of fact to be decided by the jury (or judge as fact finder). *Id.* With those introductory matters out of the way, we turn to the substance of this case.

A. *Tort vs. Contract*

■ We give short shrift to AIAC's initial argument that we should affirm because Galvin failed to challenge the breach of contract judgment entered by the district court. While it is true that AIAC's complaint raised both tort and contract claims, these claims were identical. Given that the alleged "breach" complained of is the failure to adhere to the appropriate standard of care, there is no difference between the tort and breach of contract claims. Thus, courts have held repeatedly that legal malpractice claims are governed by tort principles regardless of whether they are brought as a tort, a breach of contract, or both.[2] *See, e.g., Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281, 285–88 (1981); *Keystone Distribution Park v. Kennerk, Dumas, Burke, Backs, Long & Salin*, 461 N.E.2d 749, 751 (Ind.App.1984); *FDIC v. Clark*, 768 F.Supp. 1402, 1410–11 (D.Colo. 1989), aff'd. 978 F.2d 1541 (10th Cir.1992); 1 Mallen & Smith, *Legal Malpractice*, §§ 8.1, 8.6.

B. *Partial Summary Judgment on Liability*

■ The main issue on appeal is not whether Galvin performed poorly, but whether the district court correctly ruled that Galvin's conduct was malpractice **as a matter of law.** We conclude that the deposition testimony of Galvin's expert witness and the behavior of Dickinson's counsel **taken together** created a factual dispute about whether Galvin's conduct fell below the applicable standard of care.

There is no question that the best method of ascertaining the cause of death would have been some discovery tool—requests for admissions, interrogatories, or depositions. In-

---

**2.** Often the only reason a plaintiff couches a legal malpractice action as a breach of contract suit is to avoid a fatal tort-based statute of limitations. See *Sherman Industries, Inc. v. Goldhammer*, 683 F.Supp. 502, 506 (E.D.Pa.1988). AIAC resorts to its contract argument to avoid Galvin's contributory negligence defense. However, as we discuss in section C, AIAC does not need this argument in order to prevail on this issue.

stead, Galvin filed a motion in limine on the eve of trial seeking to force the plaintiff's counsel to state what the plaintiff's evidence would show on this vital fact. The central question, therefore, is whether Galvin's method of ascertaining the cause of death was negligent as a matter of law.

■ Galvin's motion essentially sought to force the plaintiff to elect a remedy. However, Fed.R.Civ.P. 8(e)(2) abolished the doctrine of election of remedies in federal court. *See Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1371 (7th Cir.1990). Thus, it seems that Galvin's motion was doomed to failure. If so, maybe that means that filing such a motion automatically would fall below the applicable standard of care. We think not.

First, the gambit almost worked. At the hearing on the motion in limine, the district court instructed the plaintiff's counsel:

> I want you to find out today from all your evidence ... whether or not there is going to be testimony over and above what you have indicated already, that the cause of death was related to [ ] causes other than this accident, i.e. the main area would be of course this possibility of malpractice that you have mentioned. And I want you to advise me of that tomorrow morning when we start.... I would be very concerned with allowing evidence in and then at the eleventh hour, striking everything, because once it's in, the damage may be done.

This instruction followed repeated attempts during the hearing by both the district court and Galvin to ascertain the theory on which the plaintiff planned to proceed at trial. In response to the court's questions about the cause of Ms. Dickinson's death and the substance of her treating physician's testimony, the plaintiff's lawyer said:

> I haven't interviewed Dr. Walsh in depth, and I haven't interviewed Dr. Kaufman in depth as to these issues [i.e. cause of death] and until they testify under oath, I honestly don't know what they're going to say.

This fails the laugh test by two country miles. The plaintiff's counsel knew exactly what the treating physicians would say on

the witness stand. Their testimony was crucial to the plaintiff's case. Plaintiff's counsel feigned ignorance only to get the damaging videotape into evidence. He knew very well that he had no evidence of any cause of death beyond the accident. Plaintiff's counsel did not suggest any other causes during his opening statement. He did not introduce any such evidence during his case in chief. And in response to the district court's queries during a hearing on defendant's motion for directed verdict, he agreed with the district court that the plaintiff had not presented any competent medical testimony or expert testimony showing the cause of death to be anything but the accident. Indeed, plaintiff's counsel acknowledged that "the weight of the evidence shows that she died as a result of the accident." He had to have known that the day before trial, at the time of the hearing on the motion in limine.

■ Assuming that Galvin's opposing counsel acted unethically in misleading the court on the cause-of-death evidence, perhaps attorneys should anticipate such behavior from opposing counsel. And regardless, plaintiff's counsel's actions were supported by the apparently ethical argument that Fed. R.Civ.P. 8(e)(2) abolished the doctrine of election of remedies. We do not think much of either argument. First, we conclude that the risk of a violation of professional ethics by opposing counsel is unforeseeable, and therefore any damages flowing from a failure to foresee the violation cannot support a malpractice finding. Rule 3.3 of the Indiana Rules of Professional Conduct ("Candor Toward the Tribunal") declares that "a lawyer shall not knowingly make a false statement of material fact ... to the tribunal." The Official Commentary to the Rules states further that:

> an assertion ... [made] in open court, may properly be made only when the attorney knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.

Rule 3.4(e) ("Fairness to Opposing Party and Counsel") provides that a lawyer shall not "in

trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence." Plaintiff's counsel did not act in accordance with these rules and we will not ignore his unethical conduct in deciding whether Galvin acted negligently as a matter of law.

■ As for the abolition of election of remedies, a pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question. Fed. R.Civ.P. 11; *Great Lakes Higher Education Corp. v. Austin Bank of Chicago,* 837 F.Supp. 892, 894 (N.D.Ill.1993). Here there could have been no legitimate doubt. While Rule 11 does not impose a continuing obligation to revise pleadings, counsel should not have opposed Galvin's motion in limine. *Thomas v. Capital Sec. Services, Inc.,* 836 F.2d 866, 874 n. 9 (5th Cir.1988) (citation omitted). But counsel did respond, stating that "it was up to the jury to determine if this is a wrongful death action or survival action." That may be, assuming available evidence for each of the two possibilities, but it does not excuse blatantly misrepresenting the facts of the case to opposing counsel, and even more importantly, to the district court.

■ Next, we are extremely wary of holding that pre-trial discovery is required as a matter of law. As we explained in *Transcraft,* we are reluctant to encourage the practice of "defensive law." 39 F.3d at 816. Of course, this does not mean that failure to conduct discovery will never constitute legal malpractice as a matter of law. Nevertheless, it will be the rare exception. The recent trend in the Federal Rules of Civil Procedure has been to prevent the overuse of pre-trial discovery, and we do not wish to buck that trend.

■ Finally, even conceding that Galvin's chosen method of knocking out the survival claim was ill-conceived, Galvin presented expert testimony to the effect that he did not breach the relevant standard of care. Under Indiana law, "expert testimony is normally required to demonstrate the standard of care by which the defendant attorney's conduct is measured." *See Hacker,* 570 N.E.2d at 953. In fact, the requirement of expert testimony in proving most types of malpractice claims

has been adopted so widely that it may be legal malpractice to litigate a legal malpractice claim without expert testimony. See *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 206 n. 16 (1st Cir.1995) (citation omitted). Expert testimony is crucial for defending as well as prosecuting a legal malpractice action. 4 Mallen & Smith, *Legal Malpractice,* § 32.23 at 238–39. Finally, under Fed.R.Evid. 704(a), an expert may testify about the ultimate issue to be decided by the trier of fact.

■ The only exception to the expert witness requirement even remotely relevant here is where the breach is so obvious that any lay person would recognize it. 4 Mallen & Smith, *Legal Malpractice,* § 32.16 at 207. Here, however, it is hardly likely that lay people know about the doctrine of election of remedies, let alone whether it has been abolished by something called the "Federal Rules of Civil Procedure." Therefore, expert testimony about the standard of care was required in this case.

Galvin's expert—a former Indiana state court judge—gave extensive deposition testimony on the standard of care issue. He explained that asking the court to force the plaintiff to choose a theory was "a reasonable tactic." He conceded that a motion for summary judgment would have had a higher likelihood of success, but that nevertheless Galvin's chosen method did not breach the standard of care. In response to probing questions by plaintiff's counsel at his deposition, Galvin's expert stated repeatedly that "it was reasonable for [Galvin] to attempt to persuade the judge that the plaintiff had to choose from the onset." Although this opinion runs squarely into the abolition of election of remedies, neither the district court nor the plaintiff's lawyers, in opposing Galvin's motion in limine, referred to the Federal Rules of Civil Procedure or, for that matter, the doctrine of election of remedies.

The expert explained that in Indiana, in the ordinary negligence case, "more frequently than not, the defendant does not take the deposition of the plaintiff's doctors." The expert also explained in greater detail about different avenues available for a defen-

dant's attorney to ascertain information crucial to his or her client's defense. He testified repeatedly that he believed that Galvin's use of the motion in limine did not breach the standard of care. He suggested a couple of strategic reasons for choosing a motion in limine, but he conceded that he did not know Galvin's actual strategy. He also pointed out that Dickinson's counsel "lost a little credibility with the judge when he asserted to the judge that he didn't know what his doctors were going to say." All in all, the expert's testimony provides sufficient "hint of inferential process" to pass muster under Fed. R.Civ.P. 56(e). *Mid–State Fertilizer v. Exchange Nat. Bank,* 877 F.2d 1333, 1339 (7th Cir.1989). The district court believed that Galvin's expert was simply wrong. That may be, but it is for the jury to determine.

This is a close case, and were we reviewing a jury verdict against Galvin, the result might be different. Nevertheless, we conclude that Galvin's expert's testimony was material and, **taken together** with the questionable conduct of the plaintiff's lawyers in opposing the motion in limine, created a genuine factual dispute as to whether Galvin's failure to ascertain the cause of death prior to trial breached the standard of care. Accordingly, we reverse and remand for a new trial on all of AIAC's malpractice allegations.[3]

#### C. *Contributory Negligence*

■■■■■ While a new trial is necessary, Galvin may not present his contributory negligence and incurred risk defenses.[4] Although contributory negligence generally is available as a defense to a legal malpractice action in Indiana, *see Hacker,* 570 N.E.2d at 958, Galvin's proffered defense fails as a matter of law. In effect, Galvin argues that AIAC was negligent in failing to settle the Dickinson case prior to trial. However, there is no legal duty to settle a case. Even assuming that AIAC's failure to settle the

case was stupid, such stupidity bore no causal connection to the injury it claims.

The lack of merit to Galvin's defense is further illustrated by taking it to its logical conclusion. Let's say that Tri–State turns out to have been a bad risk. Does that mean that Galvin can raise AIAC's "negligent" decision to underwrite Tri–State as a defense to this lawsuit? Of course not. As a general matter, people and corporations often retain attorneys because they somehow have created their own problems. Once retained, the attorney is not shielded from liability because of the initial mistake. A criminal defendant suing his attorney for legal malpractice would not be contributorily negligent merely because he actually had committed the charged crime. This is not to say that a client's conduct can never be contributorily negligent vis-a-vis his or her attorney. If AIAC actively had prevented Galvin from deposing the doctors, or had assisted Galvin in devising the motion in limine "strategy," then perhaps Galvin's defense would be viable. 2 Mallen & Smith, *Legal Malpractice,* § 20.2 at 641. Here, however, we agree with the district court that Galvin's contributory negligence defense fails.

#### CONCLUSION

For the foregoing reasons, we REVERSE in part the judgment of the district court and remand for a new trial, at which Galvin will be precluded from raising the defenses of contributory negligence and incurred risk.

REVERSED IN PART AND REMANDED.

POSNER, Chief Judge, dissenting.

I would affirm on liability and reverse on damages, directing the district court to enter judgment for the full award. To explain why will take a while, because of the number of issues.

A truck driver for Tri–State Motor Transport Company, AIAC's insured, had hit an automobile driven by Virginia Dickinson, ser-

---

3. The failure to ascertain the cause of death was only one of a laundry list of malpractice allegations that went to the jury. However, given its preeminence, and the fact that the jury delivered a general verdict of liability, we must reverse the jury verdict and the earlier summary judgment ruling and remand for a new trial.

4. We treat the two defenses as interchangeable and refer to them jointly as "contributory negligence."

iously injuring her. She died in the hospital a month later of a pulmonary embolism. The suit brought on her behalf against Tri–State sought damages under both the Indiana survival statute, Ind.Code 34–1–1–1, and the Indiana wrongful-death statute, Ind.Code 34–1–1–2. In a case governed by the survival statute, as amended shortly before the accident, the personal representative of a deceased tort victim can obtain the full common law damages sustained by the victim, including damages for pain and suffering, but probably excluding punitive damages. *Mundell v. Beverly Enterprises–Indiana, Inc.*, 778 F.Supp. 459, 461–64 (S.D.Ind.1991). In a case governed by the wrongful-death statute, the only damages recoverable are the victim's medical and funeral expenses plus any pecuniary or other loss incurred by the victim's survivors. If the victim dies as a result of the accident, the case is governed by the wrongful-death statute; if the victim dies from unrelated causes, the case is governed by the survival statute. Since the victim's pain and suffering are not recoverable under the wrongful-death statute, evidence of pain and suffering is inadmissible at the trial of a wrongful-death case.

Mrs. Dickinson had suffered acutely as a result of the injuries that she sustained in the accident. Some of this suffering was captured on a videotape that had been made of her in the hospital, no doubt with litigation in mind—for the suit on her behalf was brought before her death. As it happened, the videotape recorded the last day of her life; she died on camera. It was apparent that the extent of Tri–State's (and hence AIAC's) financial exposure depended critically on whether the suit brought on Mrs. Dickinson's behalf was a survival suit or a wrongful-death suit. There was no doubt about Tri–State's liability; the only issue was damages. The amount of those damages depended on whether damages for pain and suffering, graphically depicted in the videotape, were recoverable. This depended in turn on whether the suit was a survival suit or a wrongful-death suit. The likelihood that it was the latter was very great. Mrs. Dickinson had been gravely injured in the accident; had spent a month in the hospital; and had died there, of a pulmonary embolism, a not infrequent complication of a protracted hospital stay. Had it not been for the accident, she would not have been in the hospital; and the protracted hospitalization had made it more likely that she would have a pulmonary embolism. The two requirements for attributing the embolism (and hence her death) to the tort were satisfied—that but for the defendant's wrongful conduct the death would not have occurred and that the defendant's conduct made the death antecedently more likely to occur. *Creek v. Village of Westhaven*, 80 F.3d 186, 189 (7th Cir.1996); *United States v.1990 Toyota 4Runner*, 9 F.3d 651, 652–53 (7th Cir.1993); Guido Calabresi, "Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr.," 43 *U.Chi. L.Rev.* 69 (1975).

Thus Galvin had only to establish that the tort had been the cause of Mrs. Dickinson's death and his client would have little reason to fear a large verdict. Galvin knew this, but for unfathomable reasons decided against serving interrogatories or requests for admissions on his adversary, deposing the doctors who had attended Mrs. Dickinson in the hospital, or otherwise establishing the cause of death and then moving for summary judgment on the survival claim. Instead he filed in advance of trial what he styled a "motion in limine." A motion in limine is a useful device for trying to exclude evidence before trial in order to prevent the trial from being interrupted by wrangles over admissibility or the jury from getting a whiff of prejudicial evidence that may in fact be inadmissible. Galvin's motion contained some requests to exclude evidence but its main thrust was different. Pointing out correctly that the survival and wrongful-death statutes could not apply to the same case, Galvin asked the judge to make the plaintiff choose between them. The plaintiff replied that it was an issue of fact what the cause of Mrs. Dickinson's death had been, that issues of fact are for the jury, that before the issue was resolved no one could know which statute applied, and that the federal rules do not require an election of remedies. The judge took the motion under advisement, and the jury was sworn and opening arguments presented.

On the second day of trial, the judge denied Galvin's motion in limine. The fatal videotape, edited down to 15 minutes or less—15 minutes of pain and suffering—was introduced. Other evidence of Mrs. Dickinson's agonies as a consequence of the tort was introduced as well. After the doctors testified about the cause of her death Galvin moved for a directed verdict on the survival claim and the motion was granted. The jury was instructed only on wrongful death, yet Galvin did not ask the judge to instruct the jury not to consider the videotape and the other evidence bearing on Mrs. Dickinson's pain and suffering.

AIAC's suit against Galvin for legal malpractice complains primarily about his failure to find out the cause of Mrs. Dickinson's death before the trial began. Had he investigated he would have discovered that her death had resulted from the tort, and he could therefore have obtained summary judgment for the insurance company on the survival claim. Then no evidence concerning Mrs. Dickinson's suffering would have been placed before the jury, and the verdict would have been much smaller.

A question of negligence, including professional negligence (malpractice), is deemed one of fact in the sense that it is to be resolved by the trier of fact, in this case the jury. But whenever the evidence on a question is so one-sided that a reasonable jury could answer it in only one way, the judge takes the question away from the jury. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). This would not have been the proper course here had the testimony of Galvin's expert witness, a former Indiana state judge, provided some basis for thinking that the "motion in limine" complied with minimum standards of competent legal representation. But it did not.

As the majority opinion points out, expert testimony is required not only to establish malpractice but also to rebut a charge (properly supported by expert testimony) of malpractice. This means that where, as in this case, the plaintiff presents expert evidence of the defendant's malpractice, and the defendant's expert falls flat on his face, the plaintiff is entitled to summary judgment. See 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 32.23, pp. 238–39 (4th ed.1996).

Even though an expert witness is not forbidden to testify concerning the ultimate issue in a case, Fed.R.Evid. 704(a), a party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue, a conclusion for which the expert cannot offer any substantiation when pressed at his deposition. To allow this would be to confuse admissibility with weight and to disregard the judge-crafted limitations on the admissibility of expert testimony. The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements. E.g., *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1338–39 (7th Cir.1989); *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir.1993); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977). The opinion in *Mid–State Fertilizer* is blunt. The Federal Rules of Evidence permit "experts to present naked opinions," but "admissibility does not imply utility.... An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," and his "naked opinion" does not preclude summary judgment. 877 F.2d at 1339. To put this differently, an expert's opinion based on "unsupported assumptions" and "theoretical speculations" is no bar to summary judgment. *Merit Motors, Inc. v. Chrysler Corp., supra,* 569 F.2d at 673; but cf. *Ambrosini v. Labarraque,* 966 F.2d 1464, 1470–71 (D.C.Cir.1992).

The point has been made with specific reference to summary judgment in cases of legal malpractice. To avoid summary judgment, "the expert testimony must be more than a bare conclusion or a denial. The evidence must include those facts that support the conclusions and be legally sufficient. The legal premises, the factual basis and the

expert's reasoning should be explained." 4 Mallen & Smith, *supra*, § 32.23, pp. 239–40.

The authorities that I have cited are inconsistent with the position taken by the majority today. (*Mid–State* does not hold, as the majority's quotation out of context suggests, that a mere "hint" of the expert's "inferential process" leading to his conclusion is enough. See 877 F.2d at 1339. But there isn't even a hint here.) They are also correct. The test for summary judgment is whether, if the evidence presented at the summary judgment stage were the evidence at trial, the party that is moving for summary judgment would be entitled to a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Sokaogon Chippewa Community v. Exxon Corp.*, 2 F.3d 219, 225 (7th Cir.1993). He would be if the only evidence that his opponent had was the testimony of an expert witness who could not give any reason for his conclusion. Otherwise there could never be summary judgment in a malpractice case, since it is always possible to find an expert witness who will testify to the conclusion that the party hiring him wants, provided the expert doesn't have to come up with any reasons for his conclusion.

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), concerning the admissibility of scientific expert testimony, has implications for nonscientific expert testimony as well. *Daubert* makes clear that it is the responsibility of the district court to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir. 1996); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996); *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 901 (7th Cir.1994). This principle, which is a principle of evidentiary admissibility and not just of weight or evaluation, applies to any expert, although what counts as intellectual rigor will be different in different fields. A lawyer who is asked to testify about the standard of care in trying a personal injury case is not expected to employ the scientific method, because he doesn't use that method in his ordinary professional work. But he is expected to defend his conclusion with reasons. That is the essence of professionalism. Galvin's expert failed to defend his conclusion with reasons, although given ample opportunity to do so. Twice the majority opinion remarks that the expert testified "repeatedly" that Galvin had not been negligent. That is true. But a conclusion is not rationally strengthened by being reiterated.

It was evident from the outset of the Dickinson suit that almost the only thing that Galvin could do for his client was to defeat the claim for damages under the survival statute and make it a wrongful-death case. The way to do this was to submit a request for an admission; if that failed, to depose the doctors; and if, as was expected and indeed came to pass, the doctors attributed Mrs. Dickinson's death to the accident, to move for summary judgment on the survival claim. Galvin's expert conceded that following this course of action—laying an evidentiary foundation for summary judgment and then moving for summary judgment—would have had brighter prospects of success than the course that Galvin chose. The question is whether that course had *any* prospects for success. The expert's testimony is not illuminating on this critical issue, because it does not explain how Galvin's course of action could be thought reasonable. In the absence of an explanation, the record that was before the magistrate judge when he granted the motion for partial summary judgment in favor of the plaintiff was bereft of any reason to think that Galvin could have achieved his object by the course he chose.

The inept choice of title for the motion ("motion in limine") is not the problem, cf. *Northwestern Nat'l Ins. Co. v. Corley*, 503 F.2d 224, 231 (7th Cir.1974), but merely the clue to the problem. Had Galvin done his pretrial homework and presented in support of the motion evidence that Mrs. Dickinson had died as a result of the trucking company's negligence, the judge would probably have granted the motion and ruled that the case was a wrongful-death case, thus in effect treating the motion as one for partial summary judgment. But lacking, as the motion

did, any supporting evidence, it could not be treated as a motion for summary judgment, but only as a motion to compel an election of remedies—to make the plaintiff choose between proceeding under the survival statute and proceeding under the wrongful-death statute, which is exactly what the motion asked for. The motion was bound to fail because the doctrine of election of remedies has, since 1938, been defunct in the federal courts, Fed.R.Civ.P. 8(a), (e)(2) and Advisory Committee Notes; *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 229 (7th Cir.1993); *Berry Refining Co. v. Salemi*, 353 F.2d 721 (7th Cir.1965); *Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540–41 (11th Cir.1986), except when used to prevent a double recovery and thus serve a substantive function rather than being merely a rule of pleading. *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1371 (7th Cir.1990); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., supra*, 984 F.2d at 230. Double recovery was not an issue here. Even if the survival claim had survived to the submission of the case to the jury, and the jury had calculated damages for both the survival claim and the wrongful-death claim, the plaintiff would not have been permitted to add the amounts together. The domains of the two statutes do not overlap and the entitlements created by them are alternative rather than cumulative, as everyone connected with the case knew.

Given the inapplicability of the doctrine of election of remedies to this case, one is not surprised that Galvin's expert was unable to explain how the "motion in limine" could have done his client any good. The judge could not have granted the motion without violating Rule 8. (Remember: Galvin presented no evidence in support of the motion; this made it a motion to force an election of remedies. Had Galvin filed a real motion in limine, a motion to bar evidence bearing only on the survival claim because there was no basis for such a claim, it would have been granted.) · The expert acknowledged that without offering evidence of the cause of Mrs. Dickinson's death, Galvin would not be able to eliminate the survival claim from the

case. This was tantamount to admitting that the course Galvin followed was futile.

Lawyers often have reasons for not going by the book—not making all the objections that might be well founded in the law of evidence, not cross-examining every witness for the other side, not calling every potential witness, not fussing over the particular wording of an instruction, not using up all one's peremptory challenges, and so forth. Lawyers have, that is to say, tactical as well as legal grounds for the decisions they make in the conduct of a lawsuit, and a good lawyer relies on both types, combining them in proportions calculated to produce the best prospects for success for his client. But Galvin's expert did not identify any tactical motive for the choice of the "motion in limine" approach. Would the judge somehow have been offended by a motion for summary judgment? Might the doctors, acting in cahoots with the plaintiff's lawyer, if deposed have changed their opinion about the cause of Mrs. Dickinson's death in a manner damaging to Galvin's client had they known he wanted to knock out the survival claim? (Yet the plaintiff's lawyer already knew that the damages would be greater if the survival claim survived to trial.) Did Galvin thus gain a litigating advantage by not tipping his hand? No answers to any such questions were forthcoming from the expert. Instead, when asked what strategy Galvin might have had in mind when he filed the motion in limine without supporting evidence, the expert replied, "I don't know what was in his mind. I could not know without asking him, and I have not asked him." Earlier, it is true, the expert had opined that Galvin "may have wanted to befuddle the plaintiffs in the presentation of their case by prevailing on this motion in limine at the onset of the trial." And, yes, we can see how filing senseless motions might befuddle the opposition. But the expert dropped this line of defense when asked the ultimate question, what Galvin's strategy might have been. The expert was as baffled as we are.

A lawyer does not buy immunity from a malpractice suit by hiring an expert to call his pratfalls "strategic." If a lawyer fails to bring suit within the statute of limitations he

will not be heard to say that his "strategy" was to surprise the defendant with a stale suit and hope the defendant neglected to plead the statute of limitations. Galvin's expert acknowledged that "strategy can be malpractice," for example when it is based on "failure to prepare."

The expert, a former Indiana state judge, may have thought he was in an Indiana state court. For he explained, as the majority opinion puts it, "that in Indiana, in the ordinary negligence case, 'more frequently than not, the defendant does not take the deposition of the plaintiff's doctors.'" No doubt lawyers do a lot of things differently in the state courts of Indiana. Maybe the doctrine of election of remedies still operates there. Maybe Galvin, too, was confused about what judicial system he was in. Anyway, this was not an ordinary negligence case.

I must consider what difference it makes that the plaintiff in the Dickinson case did not contest Galvin's motion *primarily* by reference to the abolition of the (procedural) doctrine of election of remedies, which made the motion groundless. (The majority opinion says that the plaintiff did not refer to the doctrine at all in opposing the motion. That is incorrect.) The plaintiff's main argument was that the cause of Mrs. Dickinson's death was a question of fact and therefore for the jury to resolve. Yet the plaintiff's lawyer must have talked to Mrs. Dickinson's doctors and therefore learned their view of the cause of her death. His statement in response to the judge's questions about the cause of death that he hadn't interviewed the doctors "in depth" and "honestly [did]n't know what they're going to say" is difficult to credit. If the lawyer was indeed lying to the judge and thus violating the standards of professional ethics, it might be argued that Galvin was not negligent after all. Negligence is a failure to respond sensibly to foreseeable risks, and the risk of a violation of professional ethics might be thought unforeseeable. Ordinarily one is entitled, in deciding how much care to use, to assume that potential injurers are using due care; otherwise pedestrians would have to walk around in armor, on pain of being found contributorily negligent when hit by a drunk driver. See *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 919–20 (7th Cir.1991), and cases cited there, including *Pilkington v. Hendricks County Rural Electric Membership Corp.*, 460 N.E.2d 1000, 1004–06 (Ind.App.1984).

There is no proof that the plaintiff's lawyer actually lied. Galvin's expert, whose testimony is all that stands between Galvin and summary judgment for AIAC, suggested no such excuse for Galvin's reckless tactic. The Dickinsons' lawyer may have been highly confident that the accident had caused Mrs. Dickinson's death yet unsure what the jury would conclude after examination and cross examination of the doctors. He may have avoided questioning the doctors in depth precisely to avoid having to acknowledge that he had no survival claim. Such ostrich behavior would skirt the line that separates canny from unethical lawyering. Maybe there is lurking somewhere a violation of Rule 11 of the civil rules as it then stood, though as far as I know sanctions were never sought or imposed. That is not the issue. Among the foreseeable risks of the practice of law is that one's opponent may not be a paragon of professional ethics. A lawyer should not assume, without evidence, that his opponent is a crook, and act accordingly (producing the forensic equivalent of the armored pedestrian); that far I go in agreement with the majority; but he does need to assume, unless he has good evidence to the contrary, that his opponent will steer close to the line, resolving all close questions in favor of his client. He needs to assume this not because all lawyers behave so, but because a significant number do, see, e.g., John S. Dzienkowski, "The Regulation of the American Legal Profession and Its Reform," 68 *Tex. L.Rev.* 451, 471 (1989), and also because the line between zealous advocacy, which the ethics of the legal profession require, and overzealous advocacy, which those ethics forbid, is hazy. A lawyer gravely disserves his client if he assumes without any basis that the opposing lawyer is a prissily straight shooter. See *Pilkington v. Hendricks County Rural Electric Membership Corp., supra,* 460 N.E.2d at 1006. It was in the plaintiff's interest in the Dickinson case to keep the survival claim alive as long as possible. Galvin knew this and should have been prepared.

The question whether a lawyer's duty of professional care extends to protecting his client from the consequences of the opposing lawyer's not being a paragon of the ethical practitioner is at once important and undeveloped. What is not open to doubt is that the lawyer who is so unrealistic about the litigation process profoundly disserves his client. Suppose that you had a promising claim and took it to a lawyer who told you he would represent you in a suit to establish the claim but added, "In conducting this litigation, I will at all times assume, unless and until I learn otherwise, that opposing counsel complies in every particular with the code of professional ethics, and I will therefore take no steps to protect you against the consequences if the assumption is incorrect." You wouldn't hire him. The personality of trial lawyers and the agonistic, emotional character of the American adversarial system of justice place enormous pressure on adherence to ethical norms. A lawyer who ignores this reality is like a military commander who takes absolutely no precautions against a gas attack by a signatory of the Geneva Convention because the Convention outlawed the use of poison gas. He needn't take as many precautions as he would against a nonsignatory, but he shouldn't wholly ignore the possibility of a breach, given the emotional and fiercely adversarial character of war with which of course litigation has often been compared. Galvin let down his client by assuming (if that is what he did, which seems unlikely) that his opponent, the personal-injury plaintiff's lawyer, was hyperethical.

Even if the majority is justified in assuming that the plaintiff's lawyer was not just a tricky ostrich, but a veritable serpent in the Eden that is the Northern District of Indiana, Galvin must lose because he had actual evidence that his opponent was being disingenuous in responding to the ill-fated motion in limine. To fail to take precautionary measures against the *known* misconduct of another person is uncontroversially negligent. E.g., *id.* at 1005; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 33, pp. 198–99 (5th ed.1984); cf. *id.*, § 65, p. 480. If you see a truck bearing down on you while you are crossing the street and you fail to make an effort to get out of the way, you are negligent even if the truck was speeding. The majority's speculations about the dishonesty of the plaintiff's lawyer in the Dickinson case are based not on testimony by that lawyer or other evidence that came to light only later; they are based solely on matters as they appeared to Galvin when the lawyer responded to the motion in limine. The lawyer claimed not to know what the doctors would testify yet the majority says that it was *obvious* that he had spoken to the lawyers and so he *must* have known what they would testify to; his coyness suggested that he wanted to cling to the survival claim, regardless of its merit, as long as possible. All this was as obvious to Galvin as it is to the judges of this panel. His failure to react must have been, in the eyes of the majority, as careless as the behavior of my hypothetical pedestrian. If so, he was negligent.

The plaintiff's lawyer, moreover, even if he knew perfectly well that the cause of Mrs. Dickinson's death was the tort, was free to oppose the motion in limine on the sole ground that it sought what the Federal Rules of Civil Procedure no longer entitle a defendant to seek—that the plaintiff make an election of his remedies. Had the lawyer done so, the motion would still have been denied, because it had no basis in law. So Galvin was not *injured* by the lawyer's allegedly unethical behavior, because had the lawyer acted ethically and confined his opposition to the unquestionably sound technical ground that it asked for something to which the Federal Rules of Civil Procedure did not entitle the movant, the motion would still have been denied and Galvin would still have been in the soup. There is no suggestion that the plaintiff's lawyer, whether unethically or otherwise, *induced* Galvin to file his foolish motion. The alleged breach of ethics occurred later, in response to the motion, and thus could not have caused Galvin to act negligently in filing such a motion.

I hope I will not be misunderstood to be advocating a rule that due care in the practice of law always requires the deposing of witnesses, even key ones. I am in entire agreement with the majority that it would be a bad rule. As we said in another malpractice case against Galvin, we do not want to

encourage "defensive law," the analogue in legal malpractice to "defensive medicine." *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark,* 39 F.3d 812, 816 (7th Cir. 1994). I wrote the *Transcraft* opinion, and have no desire to undermine it. Many suits are conducted in federal court without any discovery, because the costs, which can of course be considerable, are deemed to exceed the benefits; this is especially likely in a case with modest stakes. But a flat rule that forgoing discovery is never negligent would be as absurd as a flat rule that failure to engage in discovery is always negligent. This is plain from the judicial response to claims of ineffective assistance of counsel in criminal cases. A failure to investigate a client's defenses in advance of trial is one of the most common grounds for a finding of ineffective assistance, see, e.g., *Brewer v. Aiken,* 935 F.2d 850, 857 (7th Cir.1991); *Antwine v. Delo,* 54 F.3d 1357, 1367 (8th Cir. 1995), which is a form of legal malpractice. It is not ineffective assistance per se, because there may be a strategic reason in a particular case for not investigating a particular issue, *Government of Virgin Islands v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 1996), though there was none here.

In civil cases, too, a failure to find out key facts in advance of trial may be negligent. As this case shows. Galvin *had* to find out before trial what the cause of Mrs. Dickinson's death had been, for unless he did the verdict was likely to shoot up by a million and a half dollars or even more. Neither the testimony of Galvin's expert witness nor the shenanigans of the plaintiff's lawyer in the Dickinson case touch this dispositive fact about Galvin's catastrophic failure. I doubt that Galvin would even have had to depose Mrs. Dickinson's doctors. A simple request for an admission should have sufficed. Maybe no more would have been required than to have his medical expert review Mrs. Dickinson's hospital charts.

I turn now to another issue presented by the appeal. Galvin argues that even if he was negligent (as I believe and the jury is quite likely to find in the next trial), so was the insurance company in failing to settle the Dickinson suit before the trial began—at least the jury should have been allowed to consider this possibility. Had AIAC settled for $853,000, as the judge in the Dickinson case thought it could have done, the injury of which it complains—the excess verdict due to Galvin's negligence—would have been averted completely. When AIAC turned down the offer, the survival claim had not been disposed of, so that the jury's verdict might be far above $853,000 and was very unlikely to be significantly below it. I therefore assume that AIAC was foolish to reject the settlement. The district court was nonetheless correct not to let Galvin interpose a defense of contributory negligence—or of "incurred risk" (a "state of venturousness on the part of the actor," *Get–N–Go, Inc. v. Markins,* 544 N.E.2d 484, 486 (Ind.1989), on rehearing, 550 N.E.2d 748 (Ind.1990)), a related defense that need not be discussed separately. Here I am in agreement with the majority, but I think the issue is a difficult and important one that would benefit from a fuller treatment.

Suppose Galvin, against the advice of all his friends and family, decides to take up hang-gliding. Even more foolishly, he fails to take any instruction or employ even the most elementary precautions and as a result is seriously injured in a crash of his hang glider. A doctor is summoned. The doctor treats him negligently, aggravating Galvin's injuries. Would it be a defense to Galvin's suit for medical malpractice that if only he hadn't been a fool, he wouldn't have been injured in the first place? Obviously not. *Cates v. Morgan Portable Building Corp.,* 780 F.2d 683, 689 (7th Cir.1985). What would be true is that he couldn't recover for the full loss inflicted by the injury but only for the difference between the loss that he would have sustained had he been treated competently and the loss he did sustain. The difference would be the loss caused by the doctor, and the rest of his loss would be the loss due to his own folly. The total loss would be properly allocated between the parties in accordance with their relative responsibility without any defense of contributory negligence or assumption of risk. Here is another example. Suppose it was pure folly for AIAC to agree to insure Tri–State, with its 63 accidents per year, against liability for

injuring other users of the roads. Had it exercised proper underwriting caution it would not have insured Tri–State and so would have lost nothing as a consequence of Galvin's negligence in defending Tri–State. Obviously AIAC's underwriting error would not be admissible to show contributory negligence in its suit against Galvin. Yet, just as in the hang-gliding accident, the law would automatically adjust the respective responsibility of foolish victim and careless professional. AIAC was out of pocket $2,050,000. All it got from the jury was $1.25 million and the difference was the loss that, in our hypothetical case (as in the real case), the insurance company would have averted by not insuring Tri–State in the first place.

The principle that animates these examples is an extended notion of mitigation of damages. People are careless and make mistakes. The mistakes have costs. But the costs can often be reduced by the intervention of skilled professionals. If those professionals botch the job, the costs of the mistakes are greater than they have to be. In a sense, the professionals have the "last clear chance" to minimize the consequences of a mistake, so by analogy to that doctrine they are held liable for their negligence even though their intervention would have been unnecessary had the victim of their ineffective ministrations been more careful in the first place. Were it easy to be careful all the time, the law might put the entire burden of cost avoidance on potential victims; but unflagging, unwavering, ceaselessly vigilant care requires a degree of self-discipline that is not realistic to expect. It is therefore not a defense to a malpractice case that there would have been no risk of harm from the lawyer's or the doctor's carelessness had the potential victim followed a course of action that would have avoided the need for a lawyer or a doctor. Had AIAC assigned a lawyer to assist Galvin and the lawyer had agreed to Galvin's foolish strategy of filing a motion in limine instead of deposing the doctors, or if AIAC had refused to allow Galvin to conduct any depositions, then AIAC would have been contributing to the risk that its "rescuer" (from its mistake in refusing to settle) would screw up the rescue, that is, botch the trial. That is a different risk from

the risk of making foolish underwriting decisions or turning down reasonable settlements and therefore of having to go to trial.

Here is another way to see this. AIAC's negligence, if negligence it was, in refusing to settle the case in advance of trial did not make it more likely that Galvin would botch the trial. For, if the case had been settled, Galvin would have had some extra time that he might have used for conducting another trial and he would have been as likely to botch that trial. Recall my earlier discussion of "cause" in law. AIAC's negligence was not a cause of the botched trial because it did not make such a disaster significantly more likely to occur, and contributory negligence is never a defense when it is not a cause of the injury of which the plaintiff is complaining. This has long been understood. In *Berry v. Sugar Notch Borough*, 191 Pa. 345, 43 A. 240 (1899), for example, the plaintiff was the motorman of a trolley that he was driving too fast when a tree fell on it and injured him. Had he been driving within the speed limit the tree would not have fallen on the trolley, because the trolley would not yet have arrived at the place where the tree fell at the time of the fall. So speeding was a "but for" cause of the accident to the motorman, yet the defense of contributory negligence failed. As it did in another famous case, *Ehret v. Village of Scarsdale*, 269 N.Y. 198, 199 N.E. 56 (1935). The plaintiff's decedent had entered a recently completed but not yet occupied house and, while asleep, was asphyxiated as a result of the negligence of the developer, who had accidentally spliced the gas main in the street to a pipe leading into the house. The plaintiff's decedent was a trespasser, but the defense of no duty to trespassers, akin to the defense of contributory negligence, failed. As it did, to take another well-known example, in *Herrick v. Wixom*, 121 Mich. 384, 80 N.W. 117 (1899). The plaintiff snuck into a circus tent without paying and sat down in the audience section, and his eye was injured when a firecracker exploded on the stage. He was, of course, a trespasser, yet the defense of no duty of care to trespassers was again rejected.

In none of the cases did the plaintiff's misconduct make an accident more likely to

occur. Berry's speeding did not make it more likely that a tree would fall on him. Had he started his journey a few minutes later and traveled within the speed limit, he would have been injured, and had he started later and sped, he would not have been injured. His speed was irrelevant to his injury except, of course, that it was a necessary condition, which is not enough to count as a cause. Had Ehret not been a trespasser, but the purchaser of the house, he would have been asphyxiated just the same; and similarly if Herrick had bought a ticket and sat down in the same seat. These cases would have been decided differently if the plaintiffs' misconduct had made it more likely that they would be injured in the way they were—if Berry had driven so fast that the trolley jumped the rails and hit the tree, causing it to fall on him; if Ehret had entered the house before it was completed and the utilities checked; if Herrick had snuck onto the stage and been injured because of his unauthorized proximity to the firecracker. And so in the present case: had AIAC given Galvin bad directions on how to conduct the case, it would have made the mishandling of the case more likely. But all AIAC did by failing to settle the case was set the stage for Galvin to screw up. The stage would have been equally well set if the plaintiff's lawyer had demanded a $10 million settlement and AIAC had rightly refused.

Galvin's argument for invoking the defense of contributory negligence not only is contrary to common law doctrine but also comes perilously close to arguing that if you turn down a "reasonable" settlement you have no right to complain if your lawyer botches the trial. That is obviously wrong. There is no legal duty to settle a case. Anyone who has a good enough case to get all the way to trial is entitled to fight for victory at trial, and if his lawyer is incompetent he has a right to sue for malpractice.

Although the district court was right not to submit a defense of contributory negligence to the jury, I think very little of the argument that AIAC precluded any defense of contributory negligence simply by including in its complaint a claim for breach of contract as well as a tort claim. It is true that its oral contract with Galvin implicitly but unmistakably required Galvin to exercise due care in the performance of the contract. It is also true that contributory negligence as such is not a defense to a suit for breach of contract. But apart from some procedural and remedial differences between tort and contract law, there are not many differences between these two fields of common law beyond those of terminology, reflecting the origins of the two fields in different English forms of action. A pertinent example is that contributory negligence in the law of tort is the failure to mitigate damages in the law of contracts. *Cates v. Morgan Portable Building Corp., supra,* 780 F.2d at 689. It would be shocking if identical conduct, here the failure of a professional to exercise due care, would have different legal consequences if the failure were complained of in the name of contract rather than in the name of tort. (It would be different if the contract for professional services specified a standard of care different from the tort standard, but that is not the case here.) Courts recognize this and so hold, as the majority notes, that the doctrines governing professional malpractice are the same whether the suit against the professional is brought as a tort suit or as a contract suit or, as here, as both types of suit.

The majority does not discuss the cross-appeal, and strictly speaking need not because it is vacating the judgment. But the issue raised by the cross-appeal is likely to recur, and we could save ourselves some time by resolving it now. The jury verdict against Tri–State (after being reduced by the judge) came to $2,300,000 and AIAC paid $2,050,000. The jury in the malpractice suit should have decided what the verdict would have been had Galvin not been negligent, and subtracted $250,000 from that amount since Tri–State would have paid the first $250,000 of any verdict. The jury was told about the $250,000 deductible, and the computation would have been a simple one. But it was told something else as well, which is why the judge cut down the verdict by $250,000 (from $1.25 million to $1 million). It was told in the instruction on damages that "the actual amount of damages sustained by [AIAC had been] ... $2.3 million" and that the jury's job was to determine "the amount which you

believe the verdict should have been." In light of the references to the $2.3 million and to the "verdict" it is apparent that the jury was being asked what the verdict against TriState would have been had Galvin not been negligent; and that verdict would have included the $250,000 deductible. The district court assumed that when the jury awarded AIAC damages of $1,250,000, it meant that the verdict in the Dickinson case would have been $1.25 million less but for Galvin's negligence, and $250,000 of this savings would have gone to Tri–State rather than to the insurance company, and so the judge subtracted this amount.

Yet the verdict was explicit that "We, the jury, ... award *damages* in the amount of" $1.25 million (emphasis added), and the jury had been informed about the $250,000 deductible. There was, moreover, no necessary incompatibility between the instruction referring to the verdict and the verdict's reference to damages. There was a verdict in Dickinson's suit for $2.3 million, as the instruction stated, and to determine damages in the malpractice action the jury *would* have to figure out what the verdict in Dickinson's case would have been but for Galvin's negligence and subtract that amount from $2.3 million. If the jury did that—if, for example, it believed that the verdict would have been $1,050,000—it came up with the correct amount of damages. Alternatively, it could have figured out what AIAC had to pay out of the $2.3 million verdict—$2,050,000—and what it would have had to pay had the jury returned a verdict for only $1,050,000—$800,-000—and subtract the second number from the first, and again the result would be $1,250,000. There is no solid reason to believe that the jury did not do either of these things and without a solid reason the judge should have left the verdict alone. *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1143–44 (7th Cir.1994); *Wassell v. Adams,* 865 F.2d 849, 856 (7th Cir.1989).